Carolyne Lohr
Daniel Lohr
38965 Dexter Rd, Space 20
Dexter, OR 97431
Telephone: (541) 292-2829
Email: gamechangerbuilding@gmail.com
Self-Represented Plaintiffs
(Each Plaintiff appears on his or her own behalf only.
Neither Plaintiff represents the other.)

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON
EUGENE DIVISION**

CAROLYNE LOHR and DANIEL LOHR,

Plaintiffs,

v.

COLORADO LAKE COOPERATIVE, INC., an Oregon cooperative corporation; COOPERATIVE MANAGEMENT, INC., an Oregon corporation; TAMIE KAUFMAN; DEBRA CARROLL; CYNTHIA FASHBAUGH; and JANE/JOHN DOES 1–10,

Defendants.

Case No. 6:26-cv-00456-AP

**FIRST AMENDED COMPLAINT
FOR DECLARATORY, INJUNCTIVE,
AND MONETARY RELIEF**

Fair Housing Act, 42 U.S.C. §§ 3604, 3617
ORS 659A.145; ORS 659A.421
ORS 124.100; ORS 124.110

**DEMAND FOR JURY TRIAL**

## I. PRELIMINARY STATEMENT

1.Plaintiffs file this First Amended Complaint pursuant to the Court's Order of July 6, 2026 (ECF No. 33), which dismissed the original Complaint without prejudice and granted leave to amend within thirty days. Daniel Lohr joins as a Plaintiff in his own right, pleading his own

distinct injuries under 42 U.S.C. §§ 3604(f)(1)(C), 3604(f)(2)(C), and 3617, as set forth in Counts IX and X.

2.This Amended Complaint is directed at the three deficiencies the Court identified. First, it identifies specific comparators — including the family that lived in this very structure at this very space before Plaintiff Carolyne Lohr bought it, and every other purchaser of a home located within this cooperative. Second, it corrects a mischaracterization of the accommodations she actually requested. She has never asked to move into an uninhabitable home. She asked Defendants to waive a contractor-licensing rule so that the son who is her caretaker could perform, on her behalf, the physical repair work her seizure disorder prevents her from performing herself — the same repairs Defendants' own rules expressly permit a resident to perform. Third, it disputes, specifically and factually, each violation recited in the termination notice.

3.This Amended Complaint also pleads a fact not previously placed before the Court, and one that bears directly on whether the home was "simply not habitable." Under Oregon law, a manufactured dwelling park landlord has no authority over the interior of a home it does not own. ORS 90.632(1) permits termination and removal for physical condition only "due to the physical condition of the exterior." ORS 90.505(1)(a)(B) excludes "aesthetic or cosmetic concerns" from the definition of deterioration altogether. The park owns the lot. Plaintiff owns the home, as titled personal property. Most of what Defendants demanded — flooring, ceilings, interior walls, interior electrical, interior plumbing, the water heater, and interior asbestos testing — lies inside a structure Defendants do not own and beyond any authority the Legislature gave them.

4.Defendants also declared the home uninhabitable. That is a determination reserved to building officials under the state building code, ORS 455.010 et seq. Defendants hold no contractor's license, employ no certified building inspector, and obtained no condemnation order. Linn County has issued none. The Linn County Planning Manager has certified in writing that the property has no violations.

5.The core of this case is narrow. Defendants sold Carolyne Lohr a manufactured home sitting on a rented space inside a residential manufactured dwelling park. They then declined to give her the residential occupancy agreement every other member holds, and substituted a “Commercial Storage Agreement” that declares the home is not a dwelling, that her payments are not rent, and that she may not be on her own property between 5:00 p.m. and 9:00 a.m. When she asked for a disability accommodation that would let her cure the conditions Defendants cited, they denied it on February 3, 2026 — without asking a question, requesting documentation, or proposing any alternative — and terminated her the next day. The stated grounds for the termination were the very conditions the denied accommodation would have allowed her to cure.

6.Carolyne Lohr is 81 years old. She has status epilepticus, a severe seizure disorder. She bought this home to live in it and to be cared for in it. Her present dwelling is a small, poorly insulated trailer whose unstable interior temperatures are triggers for her seizure disorder; the home at Space 1020 is larger, better insulated, and climate controlled, and it is the home in which she intends to spend the remainder of her life, with her son and caretaker able to be present overnight. She has now been kept out of the home she owns for more than seven months.

**<u>The sequence, in plain terms.</u>**

7.Defendants owned a manufactured home at Space 1020 in their own park. The family that had lived in it, the LeGoretta family, could not meet Defendants' standards, and Defendants negotiated their departure.

8.Defendants advertised the home and sold it at their own auction. Plaintiff Carolyne Lohr was the high bidder. She paid, and title to the home passed to her. Defendants kept the money and kept the land.

9.Defendants approved her as a member of the Cooperative. Their own Bylaws permit membership only for a person who owns a home in the community and lives in it or intends to.

10.Defendants then did not give her the lease that every other resident of the park has. They gave her a document they called a Storage Agreement. No other person in the park has one. Defendants' property manager has so testified.

11.That document does three things no other resident's agreement does. It bars her from her own home between 5:00 p.m. and 9:00 a.m. It requires work inside a home Defendants do not own, including a third-party asbestos inspection of the interior. And at Section 11 it provides that if she has not moved in, moved out, or sold the home by the end of its term — September 30, 2026 — Defendants may take the home and sell it "without further notice, accounting, or liability."

12.She cannot move in, because Defendants will not give her the lease. She cannot sell, because Defendants have told prospective purchasers that they hold a lien on the home and have posted notices on it saying so. Defendant Carroll has testified under oath that the Cooperative holds no lien on the home.

13.Plaintiff is 81 years old and has a seizure disorder. She asked Defendants twice, in writing, on January 5 and January 25, 2026, for a single accommodation: permission to have her

son perform the interior work, which Defendants' own Rule 5.2.1 permits a resident to do with Board approval.

14.Defendants denied the request on February 3, 2026. On February 4, 2026 — the next day — Defendants issued a notice terminating her.

15.Defendants have refused her rent payments since. She still owns the home. She still cannot live in it. Defendants continue to hold the land beneath it, and Section 11 continues to run.

16.That is the case. Plaintiff bought a home from Defendants, Defendants took her money, and Defendants have since made it impossible for her either to live in the home or to sell it — while a clause they wrote prepares to transfer the home back to them for nothing. The only person in this park to whom any of this has happened is, on information and belief, the only applicant to have disclosed a disability and requested an accommodation.

## II. JURISDICTION AND VENUE

17.This Court has subject matter jurisdiction under 28 U.S.C. § 1331 because this action arises under the laws of the United States, and under 28 U.S.C. § 1343(a)(3)–(4) because it seeks to redress the deprivation of rights secured by an Act of Congress providing for equal rights.

18.The Fair Housing Act confers an express private right of action. 42 U.S.C. § 3613(a)(1)(A). This action is filed within two years of the occurrence and termination of the discriminatory housing practices alleged, and the alleged practices are continuing.

19.This Court has supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367(a) because they arise from the same case or controversy — the same purchase, the same accommodation requests, the same denial, and the same termination.

20.Venue is proper under 28 U.S.C. § 1391(b)(1) and (b)(2). The property is located in Linn County, Oregon. Defendants reside in or transact business in this District. The events giving rise to these claims occurred in this District.

21.Assignment to the Eugene Division is proper under LR 3-2(b).

## III. PARTIES

### A. Plaintiff

22.Plaintiff Carolyne Lohr is an 81-year-old resident of Lane County, Oregon. She resides at 38965 Dexter Road, Space 20, Dexter, Oregon 97431. She is the titled owner of the manufactured home identified by the State of Oregon as Home ID No. 157575, located at Space 1020, Colorado Lake Cooperative, Corvallis, Oregon.

23.Plaintiff has status epilepticus, a severe and documented seizure disorder. She is also hard of hearing and has suffered a stroke. Her seizure disorder substantially limits one or more major life activities, including but not limited to performing manual tasks, lifting, bending, climbing, working, and caring for herself. She is a person with a handicap within the meaning of 42 U.S.C. § 3602(h) and a person with a disability within the meaning of ORS 659A.104.

24.Plaintiff is an "aggrieved person" within the meaning of 42 U.S.C. § 3602(i) and an "aggrieved individual" within the meaning of OAR 839-005-0195.

25.Plaintiff Daniel Lohr is an adult resident of Lane County, Oregon, residing at the same address. He is Carolyne Lohr's son and full-time caretaker. He is the lienholder of record on the manufactured home at Space 1020, registered in the Oregon Manufactured Home Ownership Document System. He performs the physical labor Carolyne Lohr cannot perform and has paid for and performed repairs to the home.

26.Daniel Lohr is a person “associated with” Carolyne Lohr within the meaning of 42 U.S.C. §§ 3604(f)(1)(C) and 3604(f)(2)(C). He is an “aggrieved person” within the meaning of 42 U.S.C. § 3602(i). He sues in his own right for his own injuries, which are distinct from Carolyne Lohr's and are set out in Counts IX and X. He does not sue on her behalf, and he does not represent her.

27.Each Plaintiff appears self-represented and signs only his or her own filings. Neither Plaintiff represents the other. Nothing in this Amended Complaint is filed in the capacity of next friend, guardian, or representative, and Plaintiffs do not seek reinstatement of the next friend appointment withdrawn at ECF No. 32.

**B. Defendants**

28.Defendant Colorado Lake Cooperative, Inc. (“CLC”) is an Oregon cooperative corporation organized under ORS chapter 62. It owns and operates a manufactured dwelling park located at 34360 Colorado Lake Drive, Corvallis, Linn County, Oregon. CLC is a “person” under 42 U.S.C. § 3602(d) and is subject to 42 U.S.C. §§ 3604 and 3617.

29.Defendant Cooperative Management, Inc. (“CMI”) is an Oregon corporation that manages the CLC park, including screening and approval of purchasers, collection of space rent, enforcement of community rules, and correspondence with Plaintiff. CMI is a “person” under 42 U.S.C. § 3602(d).

30.Defendant Tamie Kaufman is sued individually and in her capacity as the property manager acting for CLC through CMI. She corresponded with Plaintiff, administered the agreement at issue, and testified about the property in the related state proceeding.

31.Defendant Debra Carroll is sued individually and in her capacity as an officer and member of the CLC Board of Directors. She participated in the decisions to deny Plaintiff's

accommodation requests, to withhold a residential occupancy agreement, and to pursue possession.

32.Defendant Cynthia Fashbaugh is sued individually and in her capacity as Secretary of the CLC Board of Directors. She participated in and memorialized the Board actions described herein.

33.Charles M. Greeff is counsel for Defendant Colorado Lake Cooperative, Inc. He is not named as a defendant in this action. Where this Complaint describes conduct of counsel, that conduct is alleged as conduct undertaken on behalf of, at the direction of, or ratified by the Defendant principals, who are responsible for it under ordinary agency principles.

34.Defendants Jane/John Does 1–10 are board members, agents, employees, or contractors of CLC or CMI who participated in the conduct alleged. Plaintiff will amend to name them when discovery identifies them.

35.At all relevant times each Defendant acted as agent for the others within the scope of that agency, and each ratified the conduct of the others. This paragraph is pleaded to establish the responsibility of the entity Defendants, under traditional agency principles, for the acts of their agents. Meyer v. Holley, 537 U.S. 280 (2003). No individual Defendant is alleged to be liable by reason of office or title alone. The liability of each individual Defendant rests on acts and omissions that the Defendant personally committed or directed, or, as alleged in Count XIV, knowingly permitted.

## IV. THE HOME AT SPACE 1020 IS A "DWELLING"

36.The Fair Housing Act defines "dwelling" as "any building, structure, or portion thereof which is occupied as, or designed or intended for occupancy as, a residence by one or more families," and includes vacant land offered for the construction of such a building. 42

U.S.C. § 3602(b). The definition turns on design and intended occupancy, not on whether anyone is presently living inside.

37.The structure at Space 1020 is a manufactured home. The State of Oregon has issued an ownership document for it that identifies the dwelling type as "Manufactured Dwelling." Plaintiff is the record owner. Daniel Lohr is the recorded lienholder in the Oregon Manufactured Home Ownership Document System.

38.The structure was designed and built as a residence. It has bedrooms, a kitchen, a bathroom, and a front entry porch. It sits on a rented space in a park that Defendants' own counsel has described in filings as a "nonprofit manufactured dwelling community."

39.Before Plaintiff purchased it, the LeGoretta family occupied this very structure at this very space as their residence for a period of years. Defendants accepted space rent for Space 1020 throughout that occupancy and treated the space as a place where people lived. The LeGoretta family was not required to sign a storage agreement.

40.Linn County zones the land on which Space 1020 sits Rural Residential, RR-2.5, and has zoned it that way since 1980. The Linn County Planning Manager has issued a written determination confirming the zoning and stating that the property has no current violations or conformance issues. The Linn County Code excludes manufactured dwellings used as storage buildings from permitted and conditional uses in that zone.

41.Defendant Kaufman referred to the structure under oath in the related state proceeding as "the home" and as "the worst home." She did not describe it as a commercial storage building.

42.On March 18, 2026, Defendants sent Plaintiff a welcome package addressed "Dear Resident" and bearing Equal Housing Opportunity logos. On that same day, Defendants returned her space rent payment on the stated ground that her arrangement was commercial storage.

43.Space 1020 is therefore a dwelling under 42 U.S.C. § 3602(b). Defendants' contractual label does not change what the structure is. A housing provider may not place a dwelling outside the Fair Housing Act by writing a different word on a form.

## V. FACTUAL ALLEGATIONS

### A. Plaintiff's Disability and Defendants' Knowledge of It

44.Plaintiff has status epilepticus. Seizure activity can be triggered or worsened by heat, temperature instability, physical exertion, and stress. She cannot safely perform sustained physical labor, work at height, or work with power tools.

45.Plaintiff's son Daniel Lohr is her caretaker. He performs the physical tasks she cannot perform.

46.Defendants knew of Plaintiff's disability no later than January 5, 2026, when she disclosed it in a written accommodation request sent by certified mail. She disclosed it again on January 25, 2026, on a form Defendants themselves supplied bearing the Equal Housing Opportunity mark. She disclosed it again in subsequent correspondence and filings.

47.In the related state proceeding, Defendant Carroll was asked whether she was aware of Plaintiff's seizure disorder when the Board authorized the eviction. She did not deny knowledge. She testified she could not answer because the matter had been discussed with the Cooperative's attorney.

### B. The Purchase

48.In or about October 2025, Plaintiff purchased the manufactured home at Space 1020. She borrowed the purchase money from her son, Plaintiff Daniel Lohr, and thereafter substantial additional sums were spent on repairs and materials. That loan is the reason Daniel Lohr is the

lienholder of record on the home in the Oregon Manufactured Home Ownership Document System.

49.Plaintiff purchased the home for one purpose: to live in it. Her present dwelling in Dexter is a small trailer with inadequate insulation and unstable interior temperatures. Heat and temperature swings are triggers for her seizure disorder. The home at Space 1020 is larger, better insulated, and equipped with functioning climate control.

50.Plaintiff applied for membership in the Cooperative. Defendants processed her application, approved her, accepted her money, and sent her a welcome package addressing her as a resident.

51.Every other person who purchases a manufactured home located within CLC and is approved by the Board receives a proprietary lease or equivalent residential occupancy agreement. That is the ordinary and expected outcome of the purchase-and-approval process at this park. On information and belief, Defendants have issued such agreements to every approved purchaser other than Plaintiff. The records establishing this are in Defendants' exclusive possession.

**<u>C. Defendants Approved Plaintiff's Membership, Which by Statute and by Their Own Bylaws Entitled Her to Rent the Space and to Occupy the Home</u>**

52.Before Plaintiff signed anything, Defendants asked her whether she intended to sell the home as an investor or to live in it. She elected to live in it. Defendants then required her to submit a full residential membership application, to undergo screening, and to pay the application fee and membership fee.

53.ORS 62.809(1) sets the qualifications for membership in a manufactured dwelling park nonprofit cooperative, including “[a]ny additional membership qualifications established in the articles of incorporation or bylaws of the cooperative.”

54.Article 3.1(3) of the CLC Bylaws sets out the Cooperative's membership qualifications in full. They are: that the applicant not constitute a direct threat to the safety of any individual, the Community, or the property of others; that the applicant not be a current illegal substance abuser and not have a history of violent or drug-related crimes; that the applicant have an acceptable credit history and credit score; that household gross income be sufficiently in excess of the space lease fee and from a verifiable, legal, and reasonably stable source; that the applicant have a three-year eviction-free rental history; and that the applicant commit to the purposes and policies of the Cooperative. The condition of an applicant’s home appears nowhere on that list. Neither does any numerical credit score, any income multiple, and any required ratio of income to housing cost; no such figure appears anywhere in the Bylaws. The only income measure the Bylaws state is the comparison in Article 3.1(3)(d) of household gross income to the space lease fee. The Bylaws also state what the Cooperative may not do. Article 2.2 provides that the Cooperative will conduct its business “in a manner designed to preserve the affordability of the sites within the community for low to moderate income homeowners,” and that the Cooperative “shall not inhibit nor exclude low and moderate-income people from becoming members and from benefitting from membership.” Article 4.3 requires a selling member to “actively market the home to low-income buyers” and, where competing offers are equal, to accept the offer from the lower-income buyer. Article 4.4 defines a lower-income family or individual as one whose total income does not exceed eighty percent of the county median income determined by the United States Department of Housing and Urban Development.

Defendants' own charter thus directs Plaintiff to sell to a low-income buyer and forbids Defendants to exclude low-income people from membership.

55.The physical condition of the applicant's home is not among the membership qualifications. Habitability is not among them. Neither word appears anywhere in the Bylaws or in the Community Rules.

56.Article 3.1(3)(g) of the Bylaws provides that "any applicant with a disability (as defined by federal or state law) who is denied membership may request the Board to consider a request for a reasonable accommodation." Defendants' own governing document directs the Board to consider accommodation requests.

57.Article 3.12 of the CLC Bylaws provides: "The Board of Directors of the Cooperative shall adopt a non-discrimination policy governing the approval of new Members." The verb is mandatory. Defendants wrote that obligation into their own charter.

58.On information and belief, the Board has never adopted the non-discrimination policy Article 3.12 requires. Plaintiff pleads this on information and belief because the Board's minutes and policy records are in Defendants' exclusive possession. If no such policy exists, then at the time Defendants decided how to treat the only applicant known to them to have a disability, they were operating a membership-approval process that their own governing document required to be governed by a non-discrimination policy, and that was governed by none.

59.Defendants approved Plaintiff's membership. On or about January 4, 2026, they issued her a written welcome letter confirming it. Plaintiff pleads the approval on the strength of that document. On or about March 18, 2026, Defendants sent her a further welcome package addressed "Dear Resident" and bearing Equal Housing Opportunity logos. On that same day, Defendants returned her space rent payment on the ground that she is not a resident. Asked about

the “Dear Resident” package in the related state proceeding, Defendant Kaufman testified that it “was a standard letter we send to everybody.” It is the letter Defendants send to residents.

60.ORS 62.809(2) provides that a cooperative “shall accept as a member any person who meets the qualifications described in subsection (1) of this section.” The verb is mandatory.

61.ORS 62.809 further provides: “Membership in a manufactured dwelling park nonprofit cooperative entitles the member to rent space for a manufactured dwelling in a manufactured dwelling park of the cooperative and to occupy the manufactured dwelling.” The entitlement runs to two things: renting the space, and occupying the dwelling.

62.Defendants' own Bylaws say the same. Article 3.1(h), titled “Membership Rights,” provides that a “Member will have a perpetual right to occupy a lot within the community as long as he or she continues payment of the lot rent and compliance with the other terms of the Member Occupancy agreement, the Bylaws of the Corporation and the Community Rules.”

63.Article 3.5 of the Bylaws lists what a qualifying applicant does upon approval, including “execute a Space Lease.” Article 3.1(1) defines a Member as one who “owns and resides (or proposes to reside)” in a home in the Community and “has signed (or proposes to sign) a Space Lease.” Article 4.5 provides that “all homes in the Community must be owner-occupied.” Article 4.7 repeats: “Homes must be owner-occupied and leasing is not permitted.”

64.Defendants approved Plaintiff as a member and then withheld the Space Lease and barred her from occupying her home. They did so on a ground — the condition of the home — that appears in no membership qualification, in no bylaw, and in no community rule.

65.Neither the Bylaws nor the Community Rules provide for, authorize, mention, or contemplate a “Storage Agreement” as a form of tenure. The only instruments the governing

documents recognize are a Space Lease for members and, under Article 4.6, a nonmember space lease. Defendants created a third instrument that exists nowhere in their own corporate charter and gave it only to Plaintiff.

**D. The Storage Agreement**

66.On or about November 26, 2025, rather than issuing Plaintiff the residential occupancy agreement every other approved purchaser receives, Defendants presented her with a document titled "Storage Agreement." It was presented on a take-it-or-leave-it basis. She signed it electronically.

67.The Storage Agreement contains the following provisions, among others:

(a)Paragraph 6 declares that the document "is not a rental agreement," that Plaintiff's payments "are not, and do not constitute payment of rent," and that "[t]here is no residential landlord/tenant relationship between the Cooperative and Owner."

(b)Paragraph 4 provides that neither Plaintiff "nor any other person or entity, shall be permitted to dwell in, reside in, inhabit or occupy the Home," and limits entry to 9:00 a.m. to 5:00 p.m. for two purposes only: showing the home to a prospective buyer, and maintaining, cleaning, fixing, repairing or removing it. Paragraph 5 makes any unauthorized occupancy grounds for termination and reserves injunctive relief to prevent it. Paragraph 10 permits termination on twenty-four hours' notice for unauthorized occupancy.

(c)Paragraph 2(d) sets September 30, 2026 as the deadline for completing the improvements listed in Exhibit A.

(d)Paragraph 2(e) and Paragraph 15(b) require a $200,000 liability and hazard policy naming the Cooperative as "a covered party or named insured." Exhibit A

requires documentation of a third-party asbestos inspection "[p]rior to beginning any work on the structure."

(e)Paragraph 8 applies residential tenant screening criteria — criminal background checks, counts of occupants, and descriptions of pets — to a document that simultaneously denies that anyone will occupy the premises.

(f)Paragraph 9 provides that a person who buys the home from Plaintiff will receive a residential lease.

(g)Paragraph 11 permits Defendants, upon expiration of the term, to retake possession of the Home and "sell or otherwise dispose of the Home and/or property without further notice, accounting or liability to Owner or otherwise."

(h)Paragraph 15(c) releases all claims accrued through the date of signing, except as to "Cooperative's entitlement to foreclosure upon its lien for sums owed."

(i)Paragraph 13 awards all costs and attorney fees to the prevailing party and fixes exclusive venue in the Linn County Circuit Court.

68.Paragraph 9 is dispositive of the comparator question. By its own terms, Defendants' contract promises a residential lease to the next purchaser of this same home at this same space — a purchaser whose disability status is unknown to Defendants. The only person to whom Defendants have refused a residential occupancy agreement for this home is the person who disclosed a disability and asked for an accommodation.

69.Plaintiff pays $565.00 per month for Space 1020. That is the same space rent other residents of the park pay. Defendants charge her the residential price while denying her the residential agreement.

70.Defendants told Plaintiff the home should be demolished before she ever signed anything. Defendant Kaufman testified on direct examination in the related state proceeding on May 1, 2026 that when she first contacted Plaintiff after the auction, "I told her that we believed that it was a demolition unit, and that that would be the best use of it," and that "because this was the worst home, it was thought they would be demolished."

71.Defendants' counsel confirmed on that record that a residential lease was the expected end state. The Court stated its understanding that "the commercial agreement was for the period of basically bringing the home into repair, after which I expected that a residential lease would be executed." Counsel for Defendants answered: "That was the expectation, yes, sir. But they never got there."

72.Defendants drafted the instrument. Defendants' counsel stated on the same record that "my client is the author of the form," taken from a form counsel had prepared years earlier. Plaintiff did not negotiate it, propose it, or draft it. It was presented to her as the condition of taking possession of a home she had already bought and paid for.

73.Defendants apply the same community rules to Plaintiff that they apply to residents. Asked in the state proceeding whether the community rules are residential or commercial, Defendant Kaufman testified: "They apply in both cases." Defendants thus enforce the residential rulebook against Plaintiff while denying her the residential agreement that rulebook accompanies. On redirect examination by their own counsel on June 8, 2026, Kaufman was asked whether the Cooperative is using this manufactured dwelling for a commercial purpose, and answered: "No."

74.The instrument disclaims the statute by its own terms. It recites that Plaintiff "expressly acknowledges" that "[t]his Agreement is not a rental agreement, as defined under

ORS 90.100," that "[p]ayment of monthly storage charges are not, and do not constitute payment of rent," and that "[t]here is no residential landlord/tenant relationship between the Cooperative and Owner."

75.ORS 90.110 provides that the arrangements it excludes from the chapter are excluded only "[u]nless created to avoid the application of this chapter." A recital by which the drafting party declares the chapter inapplicable, presented to an unrepresented 81-year-old purchaser as the condition of taking possession of a home she had already bought, is the circumstance that preamble addresses. ORS 90.245(1)(a) separately provides that a rental agreement may not provide that the tenant agrees to waive or forgo rights or remedies under the chapter, and ORS 90.245(2) provides that a provision prohibited by subsection (1) included in a rental agreement is unenforceable. The Uniform Commercial Code states the same principle for the security interest Section 11 creates: it applies to a transaction "regardless of its form" that creates a security interest in personal property by contract. ORS 79.0109(1)(a). In both bodies of law the classification follows the substance of the transaction, not the caption the drafting party places on it.

76.The rules Defendants seek to enforce were never attached to the instrument they seek to enforce them under. Defendant Kaufman testified in the related state proceeding that the Community Rules "were attached to an email, and she read them online, but they were not attached to this document."

77.The instrument Defendants used is a creature of statute, and the statute places it after a tenancy has ended, not before one begins. ORS 90.675 is captioned "Disposition of manufactured dwelling or floating home left in facility," and it provides that a storage agreement entitles the holder to store the personal property "on the previously rented space during the term

of the agreement, but does not entitle anyone to occupy the personal property." ORS 90.545 addresses a written storage agreement upon termination of a tenancy. Both are post-tenancy instruments. Neither authorizes a landlord to hand a storage agreement to an incoming purchaser who has bought a home and intends to live in it.

78.The statute also limits who may be given one. A storage agreement under ORS 90.675 runs to a lienholder, ORS 90.675(20)(a); to a personal representative, designated person, heir or devisee of a deceased tenant, ORS 90.675(21)(d); or to a tenant of a marina, ORS 90.675(22)(a). Plaintiff is none of those. She is a purchaser and an owner. No abandonment notice was ever issued to her and no statutory waiting period ever ran as to her.

79.What the statute did require, Defendants did not do. ORS 90.510(4) provides: "Every landlord who rents a space for a manufactured dwelling or floating home shall provide a written rental agreement." Defendants rented Plaintiff a space, charged her the space rent, and provided no rental agreement. They provided an instrument that by its own statutory definition does not entitle anyone to occupy — which is precisely the effect Defendants have given it.

80.The instrument has no place in the statutory scheme. ORS 90.510(4) requires that "[e]very landlord who rents a space for a manufactured dwelling or floating home shall provide a written rental agreement." ORS 90.675 authorizes storage agreements only for lienholders, personal representatives, designated persons, heirs, devisees, and marina tenants. Defendants' own Bylaws recognize two instruments: a Space Lease and a nonmember space lease. Defendants invented a third category and gave it to one person.

**<u>E. Removal or Replacement of the Home Was the Objective, and Section 11 Was the Mechanism</u>**

81.Defendants' objective with respect to this home was not repair. It was removal or replacement of the structure.

82.Before Plaintiff signed anything, Defendant Kaufman asked her in writing whether she wished to apply for membership in the Cooperative and live at the space, or whether the parties were instead “planning something else where we would create a storage agreement.” That communication is a record of the Cooperative’s own property-management system, and Defendant Fashbaugh, the Cooperative’s Secretary, so authenticated it under oath in the related state proceeding. From the outset, therefore, the Storage Agreement was presented as the alternative to residential membership and residence — not as a step toward them.

83.In a further written communication on or about November 13, 2025, Defendant Kaufman set out the steps Plaintiff was to take: sign the storage agreement “until the home is habitable or replaced,” and then sign a membership agreement. Replacement of the home thus appears in Defendants’ own writing, before execution, as a contemplated outcome of the arrangement they were offering.

84.Defendant Kaufman testified under oath in the related state proceeding that this home “was meant to be demolished, not for a remodel”; that it is “a 1972 property”; that it “probably has asbestos”; and that it “likely has aluminum wire.”

85.Asked why Plaintiff had been given a storage agreement rather than the proprietary lease her approved membership entailed, Defendant Kaufman testified that the storage agreement had been negotiated so that Plaintiff could bring the house to standards “because you chose not to replace it.”

86.A licensed Oregon contractor of approximately thirty-five years’ standing testified in the same proceeding that when he walked through this home with the site manager and two other

persons on site, they asked him whether he would tear it down, and that he told them no. He testified that the home had good bones, that it had no soft spots, and that what it needed was to be cleaned up — that, basically, was all it needed. He had himself bid to purchase the home and was outbid.

87.Oregon law does not permit a facility landlord to compel what Defendants wanted on the grounds Defendants gave. ORS 90.632(1) permits a landlord to require removal of a manufactured dwelling from a facility only “due to the physical condition of the exterior” of the dwelling, and only on the procedure that section prescribes. ORS 90.632(2) provides that a landlord may not require removal of a dwelling, or consider a dwelling to be in disrepair or deteriorated, “because of the age, size, style or original construction material” of the dwelling. ORS 90.680(12) states the same prohibition in the purchaser-approval context. Age and original construction material are precisely the grounds Defendants’ own property manager gave under oath: a 1972 home that likely contains aluminum wiring.

88.The Legislature drew a fourth line in 2025, and it reaches the asbestos demand directly. By House Bill 3054, enacted in the 2025 Regular Session, the Legislature added a new subsection to ORS 90.680:

> “A landlord may not require that a selling tenant, prospective purchaser or purchaser consent to the inspection of the interior of the dwelling or home or obtain an inspection of the interior of the dwelling or home by a third party, including as a condition of: (a) Acceptance of the notice of sale under subsection (8)(a) of this section; (b) Approval of a sale under this section; or (c) Approval of a new tenancy by the purchaser.” ORS 90.680(15).

89.The amendment was in force before Plaintiff signed anything. House Bill 3054 was enacted as Oregon Laws 2025, chapter 387, carried an emergency clause, and took effect September 1, 2025. Defendant Kaufman testified in the related state proceeding that Plaintiff

signed the Storage Agreement on November 26, 2025 — eighty-seven days after the prohibition took effect. Defendants imposed the interior-inspection condition on Plaintiff at a time when Oregon law already forbade it.

90.Defendants also described the bargain in the precise language the Legislature had just removed. In opening statement in the related state proceeding, counsel for Defendants stated that Plaintiff had agreed to make “certain repairs and improvements.” The 2025 enactment struck “improvements” from ORS 90.680(9)(a)(E) and struck “including aesthetic or cosmetic improvements” from ORS 90.680(9)(a)(D). Defendants were still operating under a version of the statute that no longer existed.

91.Defendants required Plaintiff — a purchaser — to obtain third-party documentation of an inspection of the interior of the home before performing any work, and made that documentation a condition of the residential tenancy they were withholding from her. That is precisely the conduct the subsection describes, and precisely the condition the subsection forbids. The same 2025 enactment removed the word “improvements” from the categories of work a landlord may require of a purchaser under ORS 90.680(9)(a)(D) and (E), leaving repairs and maintenance. The Legislature has moved steadily against a facility landlord’s claimed authority over the inside of a home it does not own, and it moved again in the year before Defendants imposed these conditions on Plaintiff.

92.Read together, the statutory scheme leaves a facility landlord no authority over the interior of a home it does not own. ORS 90.632(1) reaches only “the physical condition of the exterior.” ORS 90.505(1)(a)(B) excludes aesthetic and cosmetic concerns from deterioration altogether. ORS 90.632(2) and ORS 90.680(12) forbid reliance on age, size, style, or original construction material. ORS 90.680(15) forbids requiring a third-party interior inspection as a

condition of a new tenancy. Every stated ground on which Defendants refused Plaintiff a lease is addressed to the interior of her home.

93.Defendants did not issue a removal notice under ORS 90.632. They wrote a contract term instead. Section 11 of the Storage Agreement provides:

> "Upon the expiration of the term of this Agreement, if Owner has not removed the Home from the Space, signed a lease agreement and taken occupancy of the Home, or completed a sale to a purchaser in compliance with the terms of this Agreement, then the Cooperative shall have the further right, without further notice, to retake possession of the Space, the Home and other personal property on the Space and may sell or otherwise dispose of the Home and/or property without further notice, accounting or liability to Owner or otherwise."

94.Section 11 identifies three exits, and Defendants control two of them. The second exit — signing a lease and taking occupancy — is the very thing Defendants have refused Plaintiff since February 4, 2026. The third exit — completing a sale to a purchaser — is the transaction Defendants have obstructed by asserting a possessory lien they do not hold and by posting physical notices on the structure directed at prospective purchasers. What is left is the first exit, removal of the home, which is the outcome ORS 90.632(2) forbids Defendants to compel on the grounds they gave — or forfeiture of the home to Defendants under Section 11.

95.On or about July 2026, days after Plaintiff listed the home for sale, Defendants caused a printed notice to be affixed with tape to the front window and the front door of the home. It reads, in full:

> "BUYER BEWARE — 34360 NE Colorado Lake Drive Space 1020. This unit is currently being advertised for sale by an UNLICENSED individual. The sale of a mobile or manufactured home requires a dealer license. [The listing agent] is not a licensed dealer. This matter has been reported to state authorities. The current owner of this UNIT is under an eviction proceeding and depending on the outcome, the cooperative may have a lien against it as part of those proceedings. Buyer of the unit may be required to cover all debt owed as a result of any lien held against the unit.

> Further, buyer will be required to remove the unit from the community at their own cost."

96. Every operative statement in that notice about Plaintiff is false. Plaintiff needs no dealer license to sell her own home: ORS 446.676 exempts "[t]he owner of a manufactured structure, as shown by a document evidencing ownership issued by any jurisdiction[,] if the person owned the manufactured structure for personal, family or household purposes." Plaintiff is the owner of record of Home ID No. 157575 and bought the home to live in. Defendants hold no lien and can hold none. ORS 90.634; ORS 90.120; ORS 90.420. And no buyer "will be required to remove the unit from the community" — Section 9 of Defendants' own Storage Agreement provides that a purchaser may be screened under Section 8 and "must enter into a lease agreement with the Cooperative."

97. The last sentence of the notice is the case in one line. Defendants told prospective purchasers, in writing, on the home itself, that the home would have to be removed from the community — the outcome ORS 90.632(2) forbids them to compel on the grounds they gave, and the outcome Defendants have wanted since before Plaintiff bought it.

98. The notice did not stand alone. In the same period, Defendant Kaufman telephoned Plaintiff Daniel Lohr and asserted that the home could not be sold because he is not a mobile home dealer, and sent an email to the same effect the following day. The notices appeared on the home the day after that. Because Defendants bar Plaintiff from the property, Plaintiff cannot monitor the home, cannot know how many prospective purchasers have read the notice and gone away, and has installed a camera in an effort to document further postings. Thereafter, and after this action was commenced, Defendants escalated the practice. In or about August 2026 a freestanding sandwich-board sign was erected in the Community, in the open and visible to persons traveling within it. It is lettered in bold capitals, with the words "BEWARE!" and

“LITIGATION!” in red, and reads: “BUYER BEWARE! Space #1020 currently in LITIGATION! Contact Management for full details: tamie@coopmgt.com.” The electronic mail address given is that of Defendant Kaufman at Defendant Cooperative Management, Inc., and is the same address from which the Storage Agreement was created, as the document’s own audit record shows. The sign identifies Plaintiff’s space by number, is addressed to no one but prospective purchasers and their agents, and directs every reader who wishes to know more to Defendants — who have told prospective purchasers that they hold a lien on the home. A witness observed the sign in place and photographs were taken. Plaintiff is informed and believes, and on that basis alleges, that the sign remains in place.

99.Section 11 operates on the expiration of the term. Paragraph 1 defines the term as ending on the earliest of five events, including “such time as Owner fails to comply with any term of this Agreement” and, at the outside, “twelve (12) months of entering into this Agreement” — that is, on or about November 26, 2026. Paragraph 2 separately requires Plaintiff to complete all Exhibit A work “by no later than September 30, 2026,” “[a]s a condition of occupying the home.” On Defendants’ own theory that Plaintiff is already in default, the term has already expired and Section 11 is already operative. Absent relief from this Court, the provision Defendants drafted transfers Plaintiff’s home to Defendants within weeks of the filing of this pleading.

100.The stated ending date does not, under Oregon law, produce the result Section 11 assumes. ORS 90.545(1) provides that a fixed term tenancy for space for a manufactured dwelling, “upon reaching its ending date, automatically renews as a month-to-month tenancy having the same terms and conditions,” unless terminated under one of the enumerated sections; ORS 90.545(2) requires a landlord seeking a new fixed term to submit a proposed agreement at

least 60 days before the ending date; and ORS 90.545(5) provides that if the landlord does not, the tenancy renews month-to-month. Section 11 treats the arrival of a date as extinguishing Plaintiff's interest in her own home. The Oregon Legislature has provided the opposite.

101. Defendants hold no security interest in the home. Asked directly in the related state proceeding whether the Cooperative holds a lien on Plaintiff's home, Defendant Carroll answered: "No." Defendants nonetheless reserved to themselves, by contract, the right to retake and dispose of a structure they do not own and in which they hold no lien — and to do so "without further notice, accounting, or liability."

102. The home is Plaintiff's titled personal property. ORS 446.003. She paid for it at Defendants' own auction. Defendant Carroll testified that the Cooperative's ownership of the home did not end at the auction, but "ended at signing of the commercial storage agreement and the handing over of the check." By Defendants' own account, then, the Storage Agreement is the instrument that closed the sale of the home to Plaintiff — and the same instrument contains the provision by which the home returns to Defendants for nothing.

103. Plaintiff Daniel Lohr is the lienholder of record on the home, registered in the Oregon Manufactured Home Ownership Document System. Section 11 purports to authorize disposition of the home without notice or accounting to anyone, which would impair or extinguish his recorded security interest without process of any kind. He is not a party to the Storage Agreement, was never given notice of the provision, and never consented to it.

104. Defendants wrote a lien into the agreement, and Oregon law forbids it. The final page of the Storage Agreement contains a mutual release of all claims "known and unknown" accrued through the date of signing, and then carves out an exception: the release does not apply "to Cooperative's entitlement to foreclosure upon its lien for sums owed." Defendants thus

reserved to themselves, in writing, a lien and a right of foreclosure against Plaintiff's manufactured dwelling.

105.No such lien exists or could exist. ORS 90.634 provides that a landlord may not assert a landlord's lien under ORS 87.162 against a manufactured dwelling or floating home located in a facility. ORS 90.120 provides that the possessory-lien statutes, ORS 87.152 to 87.212, do not apply to the rights and obligations of landlords and tenants under ORS chapter 90. ORS 90.420 abolishes distraint for rent. And Defendant Carroll testified under oath in the related state proceeding that the Cooperative holds no lien on Plaintiff's home.

106.The contractual lien recital is the origin of the possessory lien Defendants have since asserted to prospective purchasers. Plaintiff pleads it not as an independent statutory violation but as evidence that the arrangement was designed from the outset to place Plaintiff's home within Defendants' reach, and as the predicate for the false statements pleaded in Count XI.

107.Oregon law further provides that a debtor "may not waive or vary" the rules requiring notification before disposition of collateral, requiring the secured party to account for and pay any surplus, and fixing the secured party's liability for noncompliance. ORS 79.0602. The right to redeem collateral may be waived "only by an agreement entered into and authenticated after default." ORS 79.0624. Section 11 was signed before any default was alleged, and purports to accomplish in advance what those statutes forbid a debtor to give up at all. Section 11 gives Defendants a secured creditor's remedy without a secured creditor's obligations — and without a security interest. Had Defendants held a perfected interest in the home, Oregon law would require them, before disposing of it, to send authenticated notification of the disposition to the debtor and to every other lienholder of record, ORS 79.0611; to conduct the disposition in a commercially reasonable manner, ORS 79.0610; to apply the proceeds in

statutory order and account to the debtor for any surplus, ORS 79.0615; and to preserve the debtor's right to redeem the collateral at any time before disposition, ORS 79.0623. Had the home instead been treated as abandoned property in a manufactured dwelling facility, ORS 90.675 would require written notice, a statutory waiting period, notice to lienholders of record, a sale, and an accounting for the proceeds. Section 11 dispenses with every one of these protections by contract. It requires no notice, no waiting period, no notice to Plaintiff Daniel Lohr as lienholder of record, no commercially reasonable sale, no right of redemption, and no accounting — and it says so in terms: "without further notice, accounting, or liability to the owner or otherwise."

108.Plaintiff pleads Section 11 not as an independent statutory violation, but as evidence of the purpose of the arrangement, as a term imposed on her and on no comparable purchaser, and as an act of coercion within the meaning of 42 U.S.C. § 3617.

**F. Defendants Had No Authority Over the Interior of a Home They Do Not Own**

109.A manufactured dwelling park is two separate estates. The park owns the real property — the lot, the space, the dirt. The homeowner owns the structure. Under ORS 446.003, a manufactured dwelling is personal property, separate from the real property on which it sits. Under ORS 90.505(1)(c), renting a space means the homeowner "secures the right to locate the dwelling or home on the real property of another in a facility for use as a residence," and "retains no interest in the real property." Under ORS 90.510, a rental agreement in a facility is an agreement for a space.

110.Title to the home at Space 1020 passed to Plaintiff. Defendants retained no ownership interest in the structure. Daniel Lohr is the recorded lienholder.

111.The Legislature drew the line explicitly. ORS 90.632(1) provides that a landlord may terminate a rental agreement and require removal of a manufactured dwelling from a facility "due to the physical condition of the exterior of the manufactured dwelling." The word "exterior" is in the statute. Interior condition is not a lawful ground.

112.The Legislature drew a second line. ORS 90.505(1)(a)(B) provides that "deterioration" "[d]oes not include aesthetic or cosmetic concerns."

113.The Legislature drew a third line. ORS 90.632(2) provides that a landlord "may not require removal of a manufactured dwelling … or consider a dwelling or home to be in disrepair or deteriorated, because of the age, size, style or original construction material of the dwelling or home" or because it predates the federal construction standards. ORS 90.680(12) states the same prohibition in the purchaser-approval context.

114.On or about January 2, 2026, Defendants issued Plaintiff a Conditions Report. It demanded work on, among other things, interior flooring, ceilings, interior walls, interior electrical, interior plumbing, the water heater, and asbestos testing inside the structure. Every one of those items is inside a home Defendants do not own. Defendants conditioned a lease of dirt on renovations to another person's titled personal property.

115.On January 2, 2026, Defendant Kaufman sent Plaintiff a written assessment that annotated Exhibit A item by item, marked every line "Not Done," and added requirements that appear nowhere in the Storage Agreement. Those additions are directed at the interior of the home.

116.Kaufman added: "Provide copies of permits obtained, the results of the asbestos test and the electrical certification that it is safe (these are often aluminum wiring and need to be replaced, an electrician will be able to give you a written determination)." She then quoted two

Community Rules, including Rule 5.2.5: “All wiring and plumbing, either inside or outside of the manufactured home, must comply with state and local codes. Any changes necessary in altering community wiring or plumbing must first be approved by the Board.”

117. Defendants therefore did demand interior work: an electrical certification of the home’s wiring, replacement of aluminum wiring, and Board approval of any interior wiring or plumbing change. No Defendant holds an electrical license, a plumbing license, a contractor’s license, or a building official’s certification. A cooperative board that requires an electrician’s written determination about the inside of a home it does not own, and reserves to itself approval of interior wiring changes, is exercising an authority ORS 90.632(1) reserves to the exterior and ORS 455.010 commits to certified building officials.

118. In the same message Kaufman wrote: “Since your contractor is not an owner occupant, the waiver of the license requirement in the state of Oregon does not apply.” Defendants thus acknowledged in writing, three days before Plaintiff’s first accommodation request, that an owner-occupant path through the licensing requirement exists — and invoked Plaintiff’s non-occupancy, which Defendants themselves imposed, as the reason it was closed to her.

119. The timing matters. On December 31, 2025, Plaintiff wrote that the cleanout and repairs were complete, that a walkthrough by a board officer had gone well, and that she was “ready to sign the lease.” Defendants’ management company answered the same day: “The board does the leases, I will let them know to check the conditions in the agreement and get in touch with you for a lease.” Two days later came the January 2 assessment marking every line “Not Done” and adding demands directed at the interior. No lease followed.

120.At trial in the related state proceeding Defendants offered a photograph of a person replacing vinyl tile inside the home as evidence of a violation. Defendants' position is therefore that the licensed-contractor requirement reaches any work, interior or exterior, performed anywhere in a home they do not own.

121.Exhibit A to the Storage Agreement is exterior work, and nothing else. Its five headings are Landscaping, Skirting, Decking and Porches, Storage/Accessory Buildings and Carport, and Home Exterior. Its items are trash and bramble removal, weeding, trimming shrubbery, replacing skirting, replacing the front porch and rear deck stairs, repainting the carport facing, removing items from the carport rafters, replacing damaged exterior trim, lights, windows, screens, gutters and downspouts, repairing the roof, and repairing the access door to the hot water heater. Exhibit A closes: "All work performed on the exterior of the Home, including decking, porches, skirting, and landscaping, must meet community standards."

122.There is exactly one demand in Exhibit A that reaches inside the home, and it is the one Oregon law forbids: "Prior to beginning any work on the structure, Owner must provide documentation of an asbestos inspection." Defendants required a third-party inspection of the interior of a home they do not own as a precondition to replacing skirting and trimming shrubbery. ORS 90.680(15).

123.The remainder of Exhibit A is cosmetic. Weeding flower beds, trimming shrubbery, repainting a carport facing, and removing items stored in rafters are not disrepair or deterioration. ORS 90.505(1)(a)(B) provides that deterioration "[d]oes not include aesthetic or cosmetic concerns." And Paragraph 2 requires all of it "[a]s a condition of occupying the home" and calls it "all improvements" — the word the Legislature struck from ORS 90.680(9)(a)(D) and (E) effective September 1, 2025, three months before Defendants used it.

124.Defendants further declared the home “not habitable.” Habitability and building-code compliance are determined under the state building code, ORS 455.010 et seq., by certified building officials. Defendant Carroll testified that she holds no contractor's license, that to her knowledge no Board member holds one, and that she is not a certified Linn County building inspector. Defendant Kaufman is not a licensed contractor or building official. No Defendant is.

125.Linn County has issued no condemnation order, no notice of violation, and no order to repair. Defendant Carroll so testified. The Linn County Planning Manager has certified in writing that the property is zoned Rural Residential RR-2.5, has been since 1980, and has no current violations or conformance issues.

126.Defendants therefore exercised authority the Legislature did not give them, over property they do not own, applying a standard no qualified official had applied, and then invoked their own unauthorized determination as the reason for refusing Plaintiff the housing every other purchaser receives. That is the “habitability” justification on which the denial rests.

127.Plaintiff pleads this not to litigate Oregon landlord-tenant law in this Court, but because the Court's July 6 Order treated the possibility that the refusal was “due to … the fact that the home was ‘simply not habitable’” as a lawful alternative explanation. A justification that exceeds the justifier's authority, is contradicted by the only licensed professional to inspect the property, and rests on a determination no building official ever made, is evidence of pretext.

128.Three further limits bear on the specific conditions Defendants imposed. ORS 90.262(1)(c) requires that a rule or regulation “appl[y] to all tenants in the premises in a fair manner.” ORS 90.525 prohibits unreasonable conditions of rental or occupancy. And ORS 90.527(1) permits a facility landlord to require renter’s liability insurance only if four conditions are all satisfied — the requirement appears in the park’s statement of policy and in the written

rental agreement; the landlord itself obtains and maintains comparable liability insurance; documentation of the landlord's coverage is posted in a common area or made available on request; and the required coverage does not exceed $100,000 per occurrence. Plaintiff pleads these provisions as the measure of Defendants' authority and not as independent claims.

129.Plaintiff sets out these provisions for a single and limited purpose. She asserts no claim in this action under Oregon's residential landlord and tenant statutes, and she does not ask this Court to adjudicate one. She sets them out because the Court's July 6 Order treated the condition of the home as a potentially lawful alternative explanation for the refusal. Each authority Defendants in fact exercised — declaring the interior of the home uninhabitable, demanding interior repairs, demanding a third-party interior inspection, demanding that the home be removed or replaced on account of its age and original construction material, and reserving to themselves a summary forfeiture of a home in which they hold no interest — is authority the Oregon Legislature has expressly withheld from facility landlords. A decisionmaker acting outside the authority the law gives it is not offering a lawful alternative explanation for its decision. It is offering evidence of pretext.

**G. The Accommodations Plaintiff Actually Requested**

130.Plaintiff has never requested permission to occupy an uninhabitable structure. She states this expressly and disavows any contrary characterization.

131.Community Rule 5.2.1, which Defendants wrote and enforce, provides: "All installations and construction must be performed by a licensed, bonded contractor, or by the resident if prior approval is obtained from the board." By its terms the rule offers two routes to compliance. The second route — doing the work oneself with Board approval — requires the physical capacity to do the work.

132.Plaintiff's disability is the barrier that prevents her from taking the second route. A person without her disability, holding the identical home under the identical rule, could satisfy Rule 5.2.1 by performing the work personally. Plaintiff cannot lift, climb, or operate tools without risking a seizure.

133.Accordingly, on January 5, 2026, and again on January 25, 2026, and again in later correspondence, Plaintiff requested the following accommodations:

(a)That the Board permit her son and caretaker, Daniel Lohr, to physically perform the repair and maintenance work at Space 1020 on her behalf and as her agent — that is, that the Board treat work performed by her caretaker at her direction as work performed by her under Rule 5.2.1. Daniel Lohr is not an outside contractor; he is the person whose hands substitute for hers.

(b)That the Board hold Defendants to the September 30, 2026 completion deadline already written into Paragraph 2(d) of their own agreement, rather than accelerating it.

(c)That upon completion of the Exhibit A items, the Board issue her the standard residential proprietary lease every other member holds, so that she can live in the home she owns with the assistance of her caretaker.

(d)That the Board waive or modify the 5:00 p.m. to 9:00 a.m. exclusion, which prevents her caretaker from being present with her overnight and prevents her from occupying the climate-controlled dwelling her medical condition requires.

134.Each requested accommodation is a modification of a rule, policy, or practice within the meaning of 42 U.S.C. § 3604(f)(3)(B). None of them asks Defendants to spend money. None

asks Defendants to lower any substantive standard of workmanship. The work would still have to be done, and done to code.

135.The nexus between the disability and the requested accommodation is direct. The rule requires either a licensed contractor or personal performance. Plaintiff's seizure disorder is what removes the second option. Substituting her caretaker's hands for her own is what restores it. Without the accommodation, Plaintiff cannot cure the very conditions Defendants invoke as the reason for refusing her a lease — which means the accommodation is necessary to afford her an equal opportunity to use and enjoy the dwelling she owns.

136.Plaintiff separately requested permission to make the repairs at her own expense. She has paid for the materials and the work herself. Defendants have refused to permit the modifications.

**H. The Denial, and the Termination One Day Later**

137.Defendants never engaged Plaintiff in any dialogue about the requested accommodations. They proposed no alternative. They asked no questions. They requested no medical documentation. They did not counter-offer.

138.On February 3, 2026, Defendants denied both accommodation requests.

139.On February 4, 2026 — the next day — Defendants served Plaintiff with a 30-day notice terminating the Storage Agreement.

140.The temporal proximity is one day. On information and belief, no other resident or purchaser at this park has ever received a termination notice within one day of any request of any kind.

141.In the related state proceeding, Defendant Carroll was asked whether the Board had voted on whether to allow Plaintiff to continue performing her own cosmetic repairs. She

testified: “We have not, because we entered into the eviction process.” Defendants did not evaluate the request and decide it. They stopped evaluating when they decided to evict.

**I. The Recited Violations Are Disputed**

142.The Court's July 6 Order observed that Plaintiff had not disputed the violations listed in the termination notice. Plaintiff disputes each of them, as follows.

143.Asbestos inspection. The demand was for third-party testing inside a structure Defendants do not own. It was outside any authority conferred by ORS 90.632(1), which reaches only the exterior, and it is expressly prohibited by ORS 90.680(15), which forbids a landlord to require that a purchaser “obtain an inspection of the interior of the dwelling or home by a third party” as a condition of approval of a new tenancy. In any event Plaintiff obtained a certified laboratory asbestos inspection. The result was: No Asbestos Detected. There is nothing to remediate. Oregon’s asbestos rules are administered by the Department of Environmental Quality under ORS chapter 468A and OAR chapter 340, division 248. A cooperative board is not the enforcing agency and has no authority to impose, waive, or excuse those requirements. Plaintiff further alleges that the owner-occupant path through those rules was closed to her only because Defendants barred her from occupying the home — the same circularity that governs Rule 5.2.1 — and she pleads that fact as bearing on Defendants’ good faith rather than as a claim of regulatory exemption. On information and belief, Defendants have never required an asbestos inspection report from any other resident or purchaser at this park.

144.On March 5, 2026, Plaintiff sent Defendants a written cure letter enclosing the laboratory asbestos report showing no asbestos detected and a written statement of habitability signed by a licensed Oregon contractor, and demanding the residential lease. Defendants did not reply.

145.Insurance. Defendants demanded a $200,000 commercial liability policy. The Community Rules that Defendants themselves adopted and enforce impose no liability insurance requirement on residents at all. The sole reference to liability insurance anywhere in the Community Rules appears in the pet provisions, where the Board "may request that the owner provide evidence of liability insurance" for certain dog breeds. There is no resident insurance rule. There is no dollar amount. The requirement imposed on Plaintiff exists nowhere in the governing documents that bind every other member of this Cooperative.

146.The insurance demand exceeded what Oregon law permits a facility landlord to require. ORS 90.527(1)(d) provides that a landlord may require renter's liability insurance in a manufactured dwelling park only if, among other conditions, "[t]he amount of required coverage does not exceed $100,000 per occurrence." Defendants demanded a $200,000 policy from Plaintiff. Plaintiff pleads this as evidence that the condition imposed on her was not one Defendants had authority to impose, and not as an independent statutory violation.

147.Defendants' own Community Rules contain no resident insurance requirement. The only liability-insurance provision anywhere in the rulebook Defendants adopted appears in the pet section, where the Board "may request" evidence of liability insurance for certain dog breeds. There is no park-wide insurance rule, no dollar figure, and no standard against which the $200,000 demand can be measured — because Defendants never adopted one.

148.In the related state proceeding, Plaintiff subpoenaed the Cooperative's insurance records for a randomly selected set of homes in the park. No such records were produced. Plaintiff alleges on information and belief that no such records exist, and that Defendants do not in fact require or verify liability insurance from the residents of this park. Defendant Carroll

testified that the Cooperative requires insurance because fire spreads quickly among manufactured homes. Plaintiff alleges that the stated rationale is applied to her alone.

149.Plaintiff nonetheless obtained and tendered a liability policy providing coverage of $200,000 or more per incident, naming CLC as an interested party. Defendant Kaufman testified under oath in the related state proceeding that she was not aware of any insurer that writes commercial storage coverage for a residential manufactured home at a residential space. On information and belief, Defendants have never audited whether other residents carry insurance and have never terminated any other resident for an insurance lapse. Plaintiff pleads the insurance demand as a term imposed on her and on no comparable purchaser, not as an independent statutory violation.

150.Licensed contractors. Rule 5.2.1 expressly permits a resident to perform the work with prior Board approval. Plaintiff requested that approval. The Board never voted on it. Defendant Carroll so testified. A violation cannot be predicated on the failure to obtain an approval that Defendants refused to consider. Further, the great majority of the demanded work — painting, flooring, interior finish work, and cosmetic repair — falls within “aesthetic or cosmetic concerns,” which ORS 90.505(1)(a)(B) excludes from deterioration entirely, and within the interior of a structure ORS 90.632(1) places beyond Defendants' reach.

151.Defendants’ contractor requirement is circular on its own terms. Asked to read Rule 5.2.1 aloud and to confirm that it permits the work to be performed “by the resident,” Defendant Kaufman testified: “If prior approval is obtained. And the resident, in this case, doesn’t exist because nobody lives there.” Defendants barred Plaintiff from residing at the space, and then denied her the resident exception on the ground that she does not reside there. The condition

Defendants imposed became the reason for the refusal. A rule that can be satisfied only by a person Defendants have excluded is not a neutral rule neutrally applied.

152.Timing. Paragraph 2(d) of Defendants' own agreement gave Plaintiff until September 30, 2026 to complete the Exhibit A improvements. The termination notice issued February 4, 2026 — approximately seven months before the contractual deadline. On the face of Defendants' own document, the obligation was not yet due.

153.Habitability. In the related state proceeding, a licensed Oregon contractor with approximately 35 years in the trade inspected the home and testified that it was habitable, that it had “good bones,” that it had no soft spots, and that nothing about it would incline him to tear it down. Asked what it needed, he testified that it needed to be cleaned up and that, basically, that was all it needed. He had himself made an offer to purchase it.

154.By contrast, Defendant Carroll testified that she does not hold a contractor's license, that to her knowledge no Board member does, that she is not a certified Linn County building inspector, and that Linn County has issued no condemnation order for the home.

155.Defendants have not produced the record of the decision. Defendant Carroll testified that there was no formal vote of the Board authorizing this action, that “there was no open board meeting where we authorized that,” that the matter was instead taken up in executive session, and that she regarded executive session matters as privileged. The minutes of that session were called for by subpoena in the related state proceeding and were not produced.

156.Plaintiff alleges that the assertion of privilege does not reach the corporate act. Whether the Board voted, when, by what margin, and on what stated ground are facts about what a corporation did, not communications with counsel. Defendants have offered the Court and Plaintiff no record of the decision they now defend, while simultaneously offering the Board’s

judgment about habitability as the reason for it. Plaintiff further alleges that these records — minutes, resolutions, and any policy adopted or not adopted under Article 3.12 — are within Defendants' exclusive control and are properly the subject of discovery in this action.

157.The agreement recites Board approval that Defendants' own witness says never happened. The signature page states that the person signing for a corporation "acknowledges that this Agreement is entered into with full approval of the Board of Directors (and pursuant to the Bylaws and Articles of Incorporation of said corporation)." Defendants Fashbaugh and Carroll executed it on November 25, 2025 as authorized agents. Defendant Carroll later testified under oath that there was no formal vote and "no open board meeting where we authorized that."

158.Defendants' stated ground for refusing Plaintiff a lease — that the home was "simply not habitable" — is therefore a conclusion reached by people with no relevant qualification, contradicted by the only licensed professional to inspect the property, unsupported by any code enforcement action, and rendered by a body that stopped evaluating the question when it chose to evict.

159.Defendants' stated grounds were not limited to habitability. They included the age of the home and its original construction material. Those are not lawful grounds under ORS 90.632(2) or ORS 90.680(12), and Defendants' reliance on them is further evidence that the habitability rationale was not the operative reason for the refusal.

**J. Comparators**

160.Plaintiff identifies the following comparators.

161.The LeGoretta family. The LeGoretta family occupied this very structure at this very space for a period of years immediately before Plaintiff purchased it. They occupied it as a residence. They were not required to sign a storage agreement. They were not required to

produce an asbestos report or commercial insurance. They were not barred from the property after 5:00 p.m. On information and belief, no member of the LeGoretta household requested a disability accommodation from Defendants.

162.The prior occupants' residential rental agreement exists and is in Defendants' possession. The LeGoretta family occupied this very structure at this very space under a residential agreement with Defendants. Their rental agreement was produced by Defendants in response to a subpoena in the related state proceeding, though it was not offered into evidence there. Defendant Kaufman testified that the LeGorettas "were unable to meet the standards after multiple attempts" and that Defendants "negotiated an agreement for them to move out." Defendants therefore held a residential tenant in this same home, in this same condition, under a residential agreement, and terminated that tenancy by negotiation rather than by declaring the structure uninhabitable.

163.The next purchaser. Section 9 of Defendants' own Storage Agreement provides that a person who buys this home from Plaintiff receives a residential lease. The same home. The same space. The same park. The same condition. The only variable is the identity and disability status of the buyer.

164.Other approved purchasers. On information and belief, every other purchaser of a manufactured home located within CLC who was approved by the Board received a proprietary lease or equivalent residential occupancy agreement, without being required to sign a storage agreement, produce an asbestos report, produce commercial insurance, or accept an overnight exclusion from their own property. On information and belief, some of those purchasers acquired homes requiring substantial repair and were permitted to perform repairs themselves under Rule 5.2.1 with Board approval.

165.Other residents performing their own repairs. Rule 5.2.1 exists because residents perform their own repairs at this park. On information and belief, Defendants have granted Rule 5.2.1 approval to non-disabled residents and have never before conditioned such approval on a demonstration of habitability, an asbestos report, or a commercial insurance policy.

166.Defendants' own property manager has confirmed each of these comparisons under oath. Asked whether other residents of the park may remain on their property after 5:00 p.m., Defendant Kaufman testified: "I don't have any other occupants that are in a storage agreement at this time." Asked whether there are any other owners of homes in this community on commercial storage agreements, she testified: "Absolutely not." Asked whether any other resident is similarly situated to Plaintiff, she testified: "No, this is the only one." Plaintiff is therefore the only person at this park held under a storage agreement, the only person barred from her own home overnight, and the only approved purchaser denied a residential occupancy agreement. That is not pleaded on information and belief. It is Defendants' own sworn testimony.

167.The price is the residential price. Plaintiff pays $565.00 per month for Space 1020 — the same space rent the residents of this park pay for the same commodity, a space on which to keep a manufactured dwelling. Defendants approved her as a member, welcomed her in writing as a member and again as a "resident," accepted the residential price, and then withheld the residential agreement from her and from no one else. A landlord that charges the residential rate, uses the residential welcome package, and applies the residential screening criteria has treated the transaction as residential in every respect except the one that would give Plaintiff the right to live in her home.

168.The amount Defendants charge confirms the character of the transaction. ORS 90.675(7)(b) provides that a storage charge "may be no greater than the monthly space rent last

payable by the tenant." Defendants charge Plaintiff $565.00 per month — the monthly space rent. They set her charge by reference to the residential rent for this space and then denied her the residential agreement that rent buys for everyone else.

169.Plaintiff's own contemporaneous statement to Defendants is in evidence in the related state proceeding as Plaintiff's Exhibit 10, offered and received on Defendants' own motion. In it she wrote: "I am confused why you're calling my home a commercial storage agreement. I am not storing boxes. I am preparing my home. I bought a house to live in, not a warehouse." Defendants were on notice throughout of the residential purpose of the transaction, because Plaintiff told them so in writing.

170.Defendant Carroll likewise testified that the lease Defendants are withholding is a space lease — a lease of the lot, the dirt underneath the home — and that "the lease comes after completion of the storage agreement." Defendants thus acknowledge that a residential space lease was always the contemplated end state of this arrangement, and that Defendants alone control whether and when Plaintiff reaches it.

171.The particulars of these comparisons — applications received, decisions rendered, leases issued, insurance certificates on file, and Rule 5.2.1 approvals granted — are contained in Defendants' own records and are not available to Plaintiff before discovery. Plaintiff pleads them on information and belief on the bases stated above.

172.Plaintiff further alleges that the Court's observation that she "is not, and has never been, a resident of CLC" describes the injury rather than a distinction. Non-residence is the condition Defendants imposed and that this action challenges. The correct comparison is between Plaintiff and other persons at the moment they purchased a home in this park and sought

Board approval — the moment at which Defendants decide who becomes a resident and who does not.

173.Plaintiff further alleges, in the alternative and independently of any comparator, direct evidence of discriminatory motivation: the denial of both accommodation requests on February 3, 2026, followed by termination on February 4, 2026; the Board's refusal to vote on the Rule 5.2.1 request because it had “entered into the eviction process”; the simultaneous transmission of a “Dear Resident” welcome package bearing Equal Housing Opportunity logos and the return of her rent check on the ground that she was not a resident; and the statements described in Section V.K below.

**K. Conduct After the Termination Notice**

174.On or about March 1, 2026, Defendants blocked Plaintiff's electronic space rent payments. On or about March 5, 2026, Plaintiff mailed a certified check for $565.00. Defendants returned it. Plaintiff has continued to tender space rent monthly by certified mail. Defendants have continued to refuse it.

175.In a courthouse hallway, outside the presence of any judicial officer, counsel for the Cooperative approached Plaintiff and her caretaker and proposed that the matter could be made to go away, characterizing Plaintiff's investment in the home as approximately ten thousand dollars. In the same exchange he told Daniel Lohr, “You're not her caretaker.” Plaintiff was unrepresented.

176.A third person was present in the hallway and witnessed the exchange. Plaintiff pleads these statements on the basis of that witness’s account and Plaintiffs’ own contemporaneous recollection.

177.In or about July 2026, counsel for the Cooperative, acting on Defendants' behalf, asserted a possessory lien against the home in writing, and physical notices were posted on the structure directed at prospective purchasers. Defendants hold no lien. Defendant Carroll so testified in the related state proceeding. The posting of notices on a dwelling to deter prospective purchasers is not advocacy before a tribunal.

178.Plaintiff alleges that the conduct in the preceding two paragraphs was directed at coercing an 81-year-old disabled woman into surrendering a home worth many times the figure proposed to her, and at interfering with her ability to realize the value of that home, because she asserted rights under the Fair Housing Act.

**L. Injury**

179.Plaintiff has been excluded from the home she owns since her purchase and continuously since February 4, 2026 — a period now exceeding seven months. She continues to live in a dwelling whose temperature instability is medically dangerous given her seizure disorder.

180.Plaintiff has suffered and continues to suffer: loss of housing; loss of the use and enjoyment of property she owns; out-of-pocket losses including the purchase price, repair costs, materials, insurance premiums, inspection costs, and tendered space rent; loss of the value of the home; and emotional distress, humiliation, anxiety, and aggravation of her medical condition.

181.The injury is ongoing and accrues daily.

## VI. CLAIMS FOR RELIEF

*Plaintiffs reallege and incorporate each preceding paragraph into each Count below. Counts I through VIII, and Counts XIV through XVII, are brought by Plaintiff Carolyne Lohr.*

*Counts IX and X are brought by Plaintiff Daniel Lohr in his own right. Counts XI, XII, and XIII are brought by both Plaintiffs.*

**COUNT I — 42 U.S.C. § 3604(f)(1): Discrimination in the Sale or Rental of a Dwelling (All Defendants)**

182.Section 3604(f)(1) makes it unlawful to discriminate in the sale or rental, or to otherwise make unavailable or deny, a dwelling to any buyer or renter because of a handicap of that buyer or renter.

183.Plaintiff is a buyer of a dwelling and a person with a handicap. Defendants knew it.

184.Defendants made the dwelling unavailable to Plaintiff by refusing to issue the residential occupancy agreement issued to every other approved purchaser, by substituting an instrument that denies she may occupy the premises at all, by barring her from the property overnight, and by terminating the arrangement one day after denying her accommodation requests.

185.The sequence can be stated in seven steps. (1) ORS 62.809(1) defines the membership qualifications, including any additional qualifications the cooperative places in its bylaws. (2) CLC's Bylaws, Article 3.1(3), list those qualifications; the condition of the applicant's home is not among them. (3) ORS 62.809(2) provides that the cooperative "shall accept as a member any person who meets the qualifications." (4) Defendants accepted Plaintiff and confirmed it in writing on or about January 4, 2026. (5) ORS 62.809 provides that membership "entitles the member to rent space … and to occupy the manufactured dwelling," and Bylaw 3.1(h) grants a member a "perpetual right to occupy a lot within the community." (6) Defendants withheld the space lease and barred occupancy, citing the condition of the home. (7)

The condition of the home appears in no membership qualification, no bylaw, and no community rule, and the determination was made by persons with no authority to make it.

186.Plaintiff does not ask this Court to enforce Oregon's cooperative statute. She pleads the sequence because it establishes that the stated reason for the denial was not a reason the governing documents permitted — which is the definition of pretext.

187.Defendants treated Plaintiff less favorably than the comparators identified in Section V.J, who are similarly situated in every material respect except disability status and the assertion of accommodation rights.

188.The Court is respectfully reminded that the McDonnell Douglas prima facie framework "is an evidentiary standard, not a pleading requirement." Swierkiewicz v. Sorema N.A., 534 U.S. 506, 510 (2002). The Ninth Circuit has confirmed that Rule 8(a), not the McDonnell Douglas presumption, supplies the standard at the pleading stage. Austin v. Univ. of Oregon, 925 F.3d 1133, 1136–38 (9th Cir. 2019).

189.Plaintiff was injured as alleged in Section V.L.

**COUNT II — 42 U.S.C. § 3604(f)(2): Discriminatory Terms, Conditions, and Privileges (All Defendants)**

190.Section 3604(f)(2) makes it unlawful to discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling, because of handicap.

191.Defendants imposed on Plaintiff terms imposed on no comparable purchaser: an instrument denying that the structure is a dwelling; a denial that her payments are rent; an overnight exclusion from her own property; a demand for asbestos documentation; a demand for a form of insurance that Defendants' own manager testified she did not know to exist; a

licensed-contractor requirement enforced without the Board approval route their own rule provides; and a summary forfeiture clause permitting seizure of the home without accounting.

192.Defendants charged Plaintiff the same $565.00 monthly space rent charged to residents while withholding the residential terms that rent purchases for everyone else.

193.Plaintiff was injured as alleged in Section V.L.

**<u>COUNT III — 42 U.S.C. § 3604(f)(3)(A): Refusal to Permit Reasonable Modifications at Plaintiff's Expense (All Defendants)</u>**

194.Section 3604(f)(3)(A) provides that discrimination includes "a refusal to permit, at the expense of the handicapped person, reasonable modifications of existing premises occupied or to be occupied by such person if such modifications may be necessary to afford such person full enjoyment of the premises."

195.The statute reaches premises "to be occupied" as well as premises already occupied. Present occupancy is not an element.

196.Plaintiff sought to make modifications to the home at her own expense — repairs to the porch, deck, skirting, roof, trim, windows, gutters, flooring, and interior finishes, together with landscaping and debris removal. These are the very items listed in Exhibit A to Defendants' own agreement.

197.The modifications are necessary to afford Plaintiff full enjoyment of the premises, because Defendants have made completion of those items the stated precondition of her occupancy.

198.Defendants refused to permit the modifications by refusing to act on the Rule 5.2.1 approval request, by refusing to permit her caretaker to perform work she cannot perform, and by terminating the arrangement before the contractual completion date.

199.Plaintiff has borne and offered to bear the entire expense.

**COUNT IV — 42 U.S.C. § 3604(f)(3)(B): Refusal to Make Reasonable Accommodations (All Defendants)**

200.Section 3604(f)(3)(B) provides that discrimination includes "a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling."

201.Plaintiff has a handicap under the Act. Defendants knew or reasonably should have known of it. The accommodations she requested may be necessary to afford her an equal opportunity to use and enjoy the dwelling. Defendants refused to make them. See McGary v. City of Portland, 386 F.3d 1259, 1262 (9th Cir. 2004).

202.The Ninth Circuit has held that a housing provider must waive a neutral policy where the plaintiff's disability is what prevents him from satisfying it, including by permitting a family member to supply what the disabled person cannot. Giebeler v. M & B Assocs., 343 F.3d 1143, 1155–57 (9th Cir. 2003) (landlord required to consider waiving no-cosigner policy where plaintiff's disability was the barrier to meeting the income standard).

203.This case presents the same structure. Rule 5.2.1 offers a resident two routes: a licensed contractor, or personal performance with Board approval. Plaintiff's seizure disorder is the barrier that closes the second route. The requested accommodation — permitting her caretaker to perform, at her direction and expense, the physical work she cannot perform — restores the option the rule already gives everyone else. In Giebeler the mother supplied the income; here the son supplies the hands.

204.The requested accommodations are reasonable. They impose no cost on Defendants, require no structural alteration of their operations, and lower no standard of workmanship. Defendants' own rule already contemplates resident-performed work.

205.Defendants engaged in no dialogue of any kind concerning the requests. They proposed no alternative accommodation, sought no further information, and requested no documentation before denying both requests on February 3, 2026. Their own Board member testified that the Board never voted on the request because it had entered the eviction process.

206.Plaintiff again states that she did not request permission to occupy an uninhabitable structure. She requested permission to make the structure habitable in the only manner her disability permits.

**COUNT V — 42 U.S.C. § 3617: Coercion, Intimidation, Threats, and Interference (All Defendants)**

207.Section 3617 makes it unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of having exercised or enjoyed, any right granted or protected by sections 3603 through 3606 of the Act.

208.Requesting a reasonable accommodation is the exercise of a right protected by section 3604. Plaintiff exercised that right on January 5, 2026, on January 25, 2026, and thereafter.

209.A section 3617 claim is not derivative of a successful section 3604 claim. In Morris v. West Hayden Estates First Addition Homeowners Ass'n, 104 F.4th 1128 (9th Cir. 2024), cert. denied, 145 S. Ct. 1127 (2025), the Ninth Circuit affirmed judgment as a matter of law against the plaintiffs on their section 3604(b) disparate treatment claim while reversing judgment as a matter of law on their section 3617 interference claim. The claims stand or fall independently.

210.Defendants coerced, intimidated, threatened, and interfered with Plaintiff by:

(a)serving a termination notice one day after denying her accommodation requests;

(b)accelerating a contractual deadline by approximately seven months;

(c)blocking her electronic rent payments and returning her certified rent checks, thereby manufacturing a default;

(d)invoking Section 11 of the Storage Agreement, a summary forfeiture clause permitting Defendants to retake and dispose of a home they do not own and in which they hold no lien, "without further notice, accounting, or liability";

(e)asserting a possessory lien Defendants do not hold and posting physical notices on the dwelling directed at prospective purchasers;

(f)approaching an unrepresented 81-year-old woman in a courthouse hallway to propose that she surrender the home for a fraction of its value; and

(g)telling her caretaker, in her presence, that he is not her caretaker.

211.Each act was taken because Plaintiff exercised rights protected by section 3604, or was designed to deter her from continuing to exercise them.

**COUNT VI — ORS 659A.145: Disability Discrimination in Real Property Transactions (All Defendants)**

212.ORS 659A.145 prohibits discrimination against an individual with a disability in real property transactions and requires reasonable accommodation in rules, policies, practices, and services when necessary to afford equal opportunity to use and enjoy a dwelling.

213.OAR 839-005-0195 defines an aggrieved individual to include one who believes the individual has been injured by an unlawful practice or discriminatory housing practice. The definition contains no tenancy requirement and no lease requirement.

214.OAR 839-005-0206(1) requires reasonable accommodation in rules, policies, practices, and services. Plaintiff incorporates Counts I through V.

215.Plaintiff is entitled to relief under ORS 659A.885, including injunctive relief, compensatory damages, and attorney fees and costs.

**COUNT VII — ORS 659A.421: Discrimination in Selling, Renting, or Leasing Real Property (All Defendants)**

216.ORS 659A.421 makes it unlawful to discriminate against a person in selling, renting, or leasing real property, or in the terms, conditions, or privileges of such transactions, because of disability.

217.OAR 839-005-0205 makes it unlawful to coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of, or on account of having aided or encouraged any other individual in the exercise or enjoyment of, rights protected by ORS 659A.145, ORS 659A.421, or the federal Fair Housing Act.

218.Plaintiff incorporates Counts I through VI and seeks relief under ORS 659A.885.

**COUNT VIII — ORS 124.100 and ORS 124.110: Financial Abuse of a Vulnerable Person (All Defendants)**

219.Plaintiff is a vulnerable person within the meaning of ORS 124.100(1) as an elderly person and a person with a disability.

220.ORS 124.110(1)(a) provides a cause of action against a person who “wrongfully takes or appropriates money or property” of a vulnerable person. Plaintiff’s principal theory arises under subsection (1)(a). Separately, ORS 124.110(1)(b) provides a cause of action where a person “wrongfully retains money or property of a vulnerable person” after a demand for its return; Plaintiff pleads subsection (1)(b) as to the purchase money she paid Defendants for the

home — money Defendants received directly from her and have refused to return while also refusing her the housing the payment was made to obtain.

221.The Oregon Supreme Court has construed these terms broadly. In Adelsperger v. Elkside Development LLC, 373 Or 621, 568 P3d 908 (2025), the Court held that a vulnerable person's right to the use and occupancy of land is "property" within the meaning of ORS 124.110(1)(a); that to "appropriate" means to exercise control over the property of another for so extended a period, or under such circumstances, as to acquire the major portion of its economic value or benefit; and that conduct is "wrongful" where it is undertaken by improper means or with improper motive, including where common-law principles of unjust enrichment supply the wrongfulness. The Court reinstated a jury verdict of $900,000, trebled, against a purchaser of a manufactured-housing-style community that acquired the land at a discount reflecting the residents' occupancy rights and then refused to honor those rights.

222.The structure of this case is the same. Defendants sold Plaintiff a home they had taken from a prior occupant; retained control of the land beneath it; refused her the space lease that would give the home its value in place; declared the home unfit by a standard no qualified official applied; demanded its demolition or replacement; and reserved to themselves, by Section 11, the right to take the home for nothing at the end of a term whose exits they control. The economic benefit of Plaintiff's property — the purchase price she paid, the repairs she funded, and the value of the home in place — accrues to Defendants if Section 11 operates as written.

223.Defendants wrongfully took and appropriated, and continue to wrongfully appropriate, Plaintiff's property within the meaning of ORS 124.110(1)(a) — both the home she owns and paid for and her right to the use and occupancy of the space on which it sits — through the mechanisms alleged above, including Section 11 and its summary forfeiture, the

manufactured defaults, the assertion of a lien Defendants do not hold, the demand that the home be removed or replaced, and the continuing exclusion of Plaintiff from the property. If Section 11 operates as written, Defendants acquire the entire economic value and benefit of Plaintiff's home for no consideration.

224.Plaintiff has demanded the return and use of her property. Defendants have refused.

225.Plaintiff is entitled to the remedies provided by ORS 124.100(2), including treble damages, attorney fees, and costs.

**COUNT IX — 42 U.S.C. §§ 3604(f)(1)(C) and 3604(f)(2)(C): Discrimination Against an Associated Person (Plaintiff Daniel Lohr, Against All Defendants)**

226.This Count is brought by Plaintiff Daniel Lohr in his own right, for his own injuries. He does not assert Carolyne Lohr's claims.

227.Section 3604(f)(1)(C) makes it unlawful to discriminate in the sale or rental, or otherwise make unavailable or deny, a dwelling to any buyer or renter because of a handicap of "any person associated with that buyer or renter." Section 3604(f)(2)(C) prohibits discrimination in terms, conditions, and privileges on the same basis.

228.Congress added these provisions in the Fair Housing Amendments Act of 1988 to reach denials of housing opportunity to persons because of their association with a person who has a disability. The House Report accompanying the amendments states the Committee's intent to prohibit not only discrimination against the primary purchaser or named lessee, but also denials of housing opportunities to applicants because they have relatives, friends, patients, or other associates who have disabilities. H.R. Rep. No. 100-711, at 24 (1988).

229.Standing under the Act is as broad as Article III permits. Trafficante v. Metropolitan Life Ins. Co., 409 U.S. 205, 209 (1972); Havens Realty Corp. v. Coleman, 455 U.S. 363, 372 (1982).

230.Daniel Lohr is a person associated with Carolyne Lohr. He is her son, her full-time caretaker, and the lienholder of record on the home.

231.Defendants made the dwelling unavailable to Daniel Lohr and imposed discriminatory terms on him because of Carolyne Lohr's handicap and because of his association with her. Specifically, Defendants:

(a)refused to permit him to enter and work on the home as Carolyne Lohr's caretaker, a refusal imposed on no comparable person;

(b)barred him, by Paragraph 4 of the Storage Agreement, from being present at the home between 5:00 p.m. and 9:00 a.m., preventing him from providing overnight care to a person with status epilepticus;

(c)denied the accommodation that would have permitted him to perform the repair work, and denied it without any interactive dialogue;

(d)told him, in Carolyne Lohr's presence, that he is not her caretaker; and

(e)invoked Section 11 of the Storage Agreement — a provision permitting Defendants to retake and dispose of the home “without further notice, accounting, or liability” — and asserted a possessory lien, either of which would impair or extinguish his recorded lienholder interest in the home without notice, accounting, or judicial process, in a contract to which he is not a party and to which he never consented, and while Defendant Carroll has testified under oath that the Cooperative holds no lien on the home; and

(f)withheld from him the nonmember space lease that Article 4.6 of Defendants' own Bylaws makes mandatory.

232.Article 4.6 of the CLC Bylaws provides: “Notwithstanding any other bylaw provision, the Cooperative shall offer a nonmember space lease at a non-member space rent to persons permitted by Oregon law to rent a space in a cooperative-owned park without being a member, such as a lien holder in title, or a current homeowner at the time the Cooperative takes title to the Park.” Article 3.4 states the same carve-out: one of the buyers or owners must become a member “unless otherwise provided by law for lien holders in title.”

233.Daniel Lohr is a lien holder in title. He is registered as such in the Oregon Manufactured Home Ownership Document System. Under Defendants' own Bylaws the Cooperative “shall offer” him a nonmember space lease. Defendants have never offered him one, have never acknowledged his status, and have instead asserted a possessory lien and posted notices calculated to extinguish his interest.

234.Daniel Lohr's injuries are his own and are distinct from Carolyne Lohr's. He has been deprived of the dwelling in which he would live with and care for his mother. He has been deprived of the ability to provide the overnight caretaking his mother's medical condition requires. He has expended his own funds and his own labor on repairs to a home from which he is excluded. His recorded security interest has been placed at risk. He has suffered emotional distress.

**COUNT X — 42 U.S.C. § 3617: Interference With a Person Who Aided or Encouraged the Exercise of Protected Rights (Plaintiff Daniel Lohr, Against All Defendants)**

235.This Count is brought by Plaintiff Daniel Lohr in his own right, for his own injuries.

236.Section 3617 makes it unlawful to coerce, intimidate, threaten, or interfere with "any person" in the exercise or enjoyment of, or on account of having aided or encouraged any other person in the exercise or enjoyment of, rights granted or protected by section 3604. The protection runs to the person who aids and encourages, not only to the person aided.

237.Daniel Lohr aided and encouraged Carolyne Lohr in the exercise of her rights under section 3604. He assisted with her accommodation requests, corresponded on her behalf at her direction, and served as her designated disability aide.

238.Defendants coerced, intimidated, threatened, and interfered with Daniel Lohr on account of that aid and encouragement, by the conduct described in the preceding Count, by approaching him and Carolyne Lohr in a courthouse hallway to propose that she surrender the home for a fraction of its value, by telling him he is not her caretaker, and by asserting a lien and posting notices that place his recorded security interest at risk.

239.Plaintiffs plead the hallway statements for the purpose of establishing Defendants' animus toward Plaintiff Daniel Lohr's caretaker role and toward the accommodation request, and not to prove the validity or amount of any claim or defense. Fed. R. Evid. 408(b).

240.Section 3617 protection is not derivative of a successful section 3604 claim. Morris v. W. Hayden Ests. First Addition Homeowners Ass'n, 104 F.4th 1128 (9th Cir. 2024).

## COUNT XI — ORS 646.639 AND ORS 646.641: UNLAWFUL COLLECTION PRACTICES

**(Both Plaintiffs against all Defendants)**

241.Plaintiffs reallege each preceding paragraph.

242.ORS 646.639(1)(g) defines a "debt collector" as any person who "by any direct or indirect action, conduct or practice, enforces or attempts to enforce an obligation that is owed or

due to any commercial creditor, or alleged to be owed or due to any commercial creditor, by a consumer as a result of a consumer transaction." Unlike the federal Fair Debt Collection Practices Act, the Oregon definition is not limited to persons collecting the debts of another. Defendants Colorado Lake Cooperative, Inc. and Cooperative Management, Inc. are each debt collectors within the meaning of the section; Cooperative Management, Inc. is additionally a third-party collector acting as agent for the Cooperative; and the individual Defendants are liable for their own direct participation in the acts alleged.

243.Defendants engaged in unlawful collection practices, including:

(a)ORS 646.639(2)(k) — attempting or threatening "to enforce a right or remedy with knowledge or reason to know that the right or remedy does not exist." Defendants asserted a possessory lien on Plaintiff's manufactured dwelling in written communications and in a notice affixed to the home. ORS 90.634 forbids a landlord's lien against a manufactured dwelling in a facility; ORS 90.120 excludes the possessory-lien statutes from Chapter 90 relationships; ORS 90.420 abolishes distraint for rent. Defendant Carroll testified under oath that the Cooperative holds no lien on the home.

(b)ORS 646.639(2)(c) — threatening "the seizure, attachment or sale of a debtor's property when such action can only be taken pursuant to court order without disclosing that prior court proceedings are required." Paragraph 11 of the Storage Agreement asserts a right to retake and dispose of the home "without further notice, accounting or liability," and the posted notice repeated the threat to prospective purchasers. Neither disclosed that court proceedings are required.

(c)ORS 646.639(2)(m) — representing “that an existing debt may be increased by the addition of attorney fees, investigation fees or any other fees or charges when such fees or charges may not legally be added to the existing debt.” Defendants’ counsel told Plaintiffs in a courthouse corridor that they should abandon the case or be responsible for attorney fees, and the posted notice told prospective purchasers they “may be required to cover all debt owed as a result of any lien held against the unit.”

(d)ORS 646.639(2)(L) — using a form of communication “which gives the appearance of being authorized, issued or approved by a governmental agency” when it is not. The posted notice states that “[t]his matter has been reported to state authorities.”

244.ORS 646.641 provides a private right of action for actual damages or $200, whichever is greater, together with punitive damages and reasonable attorney fees. Plaintiffs have sustained actual damages, and in the alternative claim the statutory minimum. This Court has supplemental jurisdiction under 28 U.S.C. § 1367(a).

## COUNT XII — DECLARATORY JUDGMENT: NO LIEN EXISTS

### (Both Plaintiffs against all Defendants)

245.Plaintiffs reallege each preceding paragraph.

246.An actual and justiciable controversy exists. Defendants assert, in Paragraph 15(c) of the Storage Agreement, in written communications to Plaintiffs, and in a notice affixed to the home and directed at prospective purchasers, that the Cooperative holds or may hold a lien on the manufactured dwelling at Space 1020. Plaintiffs deny that any lien exists or lawfully could exist.

247.The controversy is concrete and is impairing Plaintiffs now. So long as the assertion stands, Plaintiff Carolyne Lohr cannot convey clear title, Plaintiff Daniel Lohr's recorded security interest is clouded, and any prospective purchaser is told in writing that the purchaser may inherit a debt and be required to remove the home from the community.

248.Plaintiffs seek a declaration under 28 U.S.C. §§ 2201 and 2202 that Defendants hold no lien, security interest, or other encumbrance on the manufactured dwelling at Space 1020, Home ID No. 157575; that Paragraph 15(c) of the Storage Agreement creates none; that ORS 90.634, ORS 90.120 and ORS 90.420 forbid the lien Defendants assert; and that Plaintiff Daniel Lohr's registered interest is the only security interest of record. Plaintiffs further seek an injunction restraining Defendants from asserting or publishing any claim of lien against the home.

## COUNT XIII — ORS 90.710(1)(a): CAUSE OF ACTION FOR VIOLATIONS OF ORS 90.680

**(Both Plaintiffs against all Defendants)**

249.Plaintiffs reallege each preceding paragraph.

250.ORS 90.710(1)(a) provides that "any person aggrieved by a violation of ORS 90.525, 90.630, 90.680 or 90.765 has a cause of action against the violator for any damages sustained as a result of the violation or $500, whichever is greater," and that "[i]f a person violates ORS 90.680 three or more times within a 24-month period, a person has a cause of action against the violator for any damages sustained as a result of the third or subsequent violation or $1,000, whichever is greater."

251.The Legislature wrote "any person aggrieved," not "the tenant." Elsewhere in the same scheme it wrote "the tenant." ORS 90.765(3); ORS 90.710(2). That difference in wording

is to be given effect. State v. Gaines, 346 Or 160 (2009). Both Plaintiffs are aggrieved: Plaintiff Carolyne Lohr as the purchaser denied occupancy, and Plaintiff Daniel Lohr as the recorded lienholder, the intended caretaker-occupant, and the person whose labor and funds were committed to the home.

252.Defendants violated ORS 90.680 at least seven separate times, all within a 24-month period:

(a)ORS 90.680(15) — Defendants required Plaintiff, a purchaser, to obtain a third-party inspection of the interior of the home as a condition of approval of a new tenancy. The prohibition took effect September 1, 2025; the condition was imposed on and after November 26, 2025.

(b)ORS 90.680(12) — Defendants refused the tenancy on grounds that included the age of the home and its original construction material, testifying that it is “a 1972 property” that “likely has aluminum wire” and “was meant to be demolished.”

(c)ORS 90.680(9)(a)(D) and (E) — Defendants required improvements as a condition of sale and tenancy, a category the Legislature removed from those subparagraphs effective September 1, 2025, and described the bargain in that deleted language.

(d)ORS 90.680(11) — Defendants did not require Plaintiff to submit an application for occupancy as a tenant under subsection (8), and did not accept or reject any such application within the period subsection (10) allows. Defendants thereby waived the right to establish conditions on and approve a purchaser, and Plaintiff was entitled to occupy on the terms applicable to the tenancy of this space.

(e)ORS 90.680(2) — Defendants denied Plaintiff the right to sell the home on its rented space. The statute provides that a landlord “may not deny any manufactured

dwelling or floating home space tenant the right to sell a manufactured dwelling or floating home on a rented space." In July 2026, Defendant Kaufman asserted by telephone, and again by email the following day, that the home could not be sold because Plaintiff Daniel Lohr is not a mobile home dealer, and the posted notice told prospective purchasers that the home was being advertised by an unlicensed individual whose sale requires a dealer license. ORS 446.676 exempts the owner. (Paragraphs 95 through 98.)

(f)ORS 90.680(2) — the posted notice stated that the "buyer will be required to remove the unit from the community at their own cost," a removal requirement imposed solely on the basis of the sale, and one contradicted by Section 9 of Defendants' own instrument, which provides that a screened purchaser "must enter into a lease agreement with the Cooperative." (Paragraphs 95 through 97.)

(g)ORS 90.680(2) — in or about August 2026 Defendants erected a sign at the entrance to the community identifying Plaintiff's space by number, warning purchasers, and directing them to Defendants for "details," a further and continuing denial of Plaintiff's right to sell the home on its rented space. (Paragraph 98.)

253.Each violation is separate, each arises from distinct conduct, and each occurred within the same 24-month period. The third and each subsequent violation therefore carries damages sustained or $1,000, whichever is greater, in addition to Plaintiffs' actual damages.

254.Plaintiffs bring this Count under the supplemental jurisdiction of this Court, 28 U.S.C. § 1367(a). Plaintiffs do not by this Count ask this Court to adjudicate the right to possession of Space 1020, which is the subject of the related state proceeding. Counterclaims tendered in that proceeding were stricken on conferral grounds under UTCR 5.010 — a

procedural ruling the state court stated expressly was not a determination on the merits — and were thereafter re-tendered. No state court has ruled on their merits. Plaintiffs are seeking the voluntary dismissal of those counterclaims, without prejudice, so that the claims pleaded in this action are adjudicated in this Court. No Oregon court has adjudicated any claim under ORS 90.680 or ORS 90.710 arising from these facts.

## COUNT XIV — ORS 124.100(5): PERMITTING FINANCIAL ABUSE OF A VULNERABLE PERSON

### (Plaintiff Carolyne Lohr against Defendants Debra Carroll and Cynthia Fashbaugh, Individually)

255.Plaintiff Carolyne Lohr realleges each preceding paragraph. This Count is brought in addition to Count VIII and states a separate statutory basis for the individual liability of Defendants Carroll and Fashbaugh. It is pleaded against no other Defendant.

256.ORS 124.100(5) provides: "An action may be brought under this section against a person for permitting another person to engage in physical or financial abuse if the person knowingly acts or fails to act under circumstances in which a reasonable person should have known of the physical or financial abuse."

257.The financial abuse permitted is the conduct alleged in Count VIII: the wrongful taking and appropriation of Plaintiff's money and property through the Storage Agreement and its Section 11 forfeiture, the manufactured defaults, the assertion of a lien Defendants do not hold, the demand that the home be removed or replaced, the retention of the purchase money, and the continuing exclusion of Plaintiff from her home. The principal actors in that conduct were Defendants Colorado Lake Cooperative, Inc., Cooperative Management, Inc., and Kaufman.

258.Defendant Carroll personally and knowingly acted, and failed to act, in the face of that conduct. She executed the Storage Agreement on November 25, 2025. She participated in the executive-session decision for which, by her own testimony, there was no formal vote and no open board meeting. She participated in the February 3, 2026 denial of Plaintiff's accommodation requests and in the decision to pursue possession. She testified that the Board stopped considering the repair question because it had entered into the eviction process. She knew Plaintiff's age, knew her disability, knew that Plaintiff had paid Defendants for the home, and knew what Section 11 provides. At no time did she act to halt, correct, or undo the conduct alleged in Count VIII.

259.Defendant Fashbaugh personally and knowingly acted, and failed to act, in the face of the same conduct. She executed the Storage Agreement on November 25, 2025. As Secretary she was the custodian of the Board's records and knew that no record exists of the approval the instrument recites. She memorialized the Board actions alleged herein and authenticated the correspondence through which the conduct was carried out. At no time did she act to halt, correct, or undo it.

260.Each of these Defendants knowingly acted and failed to act under circumstances in which a reasonable person should have known of the financial abuse. Neither is alleged to be liable by reason of office or title; each is liable for what she personally did and personally failed to do. Cf. Adelsperger v. Elkside Development LLC, 371 Or 61, 529 P3d 230 (2023) (statutory liability shield of an entity does not categorically bar claims under ORS 124.100 to 124.140 against the individuals who manage it, based on their own conduct).

261.Plaintiff is entitled against each of these Defendants to the remedies provided by ORS 124.100(2), including treble economic damages, treble noneconomic damages, attorney fees, and costs.

262.Pursuant to ORS 124.100(6), Plaintiff is mailing a copy of this First Amended Complaint to the Attorney General of the State of Oregon concurrently with its filing, and will file proof of mailing with the Court.

**COUNT XV — BREACH OF IMPLIED WARRANTY OF AUTHORITY**

**(Plaintiff Carolyne Lohr against Defendants Debra Carroll and Cynthia Fashbaugh, Individually)**

263.Plaintiff Carolyne Lohr re-alleges each preceding paragraph. This Count is pleaded against Defendants Carroll and Fashbaugh only, in the alternative to and in addition to her other Counts. Fed. R. Civ. P. 8(d)(2).

264.On November 25, 2025, Defendants Carroll and Fashbaugh each executed the Storage Agreement as authorized agents for Colorado Lake Cooperative, Inc. The signature page states that the person signing for a corporation "acknowledges that this Agreement is entered into with full approval of the Board of Directors (and pursuant to the Bylaws and Articles of Incorporation of said corporation)."

265.By executing the instrument in that form, each of them represented and warranted to Plaintiff, in her own name and above her own signature, that she held authority conferred by full approval of the Board of Directors, granted in the manner the Bylaws and Articles of Incorporation require.

266.The warranted authority did not exist as warranted. Defendant Carroll testified under oath on June 23, 2026 that there was no formal vote of the Board and that there was "no open

board meeting where we authorized that." Defendants have produced no minutes, no resolution, and no other record of the approval the signature page recites, although the minutes were called for by subpoena in the related state proceeding.

267.An agent who purports to contract on behalf of a principal warrants to the other contracting party that the agent has the authority claimed, and is personally liable for the loss caused if that authority does not exist. Restatement (Third) of Agency § 6.10 (2006). The liability is the agent's own. It does not depend on any liability of the Cooperative, and it requires no disregard of the corporate form, because the warranty is a representation the agent makes personally to the party with whom the agent deals.

268.Plaintiff dealt with Defendants Carroll and Fashbaugh in reliance on the warranted authority. She executed the instrument; she paid the $565 monthly charge it exacted; she submitted to its conditions; she forbore other courses of action; and she has been subjected to its occupancy bar, its insurance demand, its release, and its Section 11 forfeiture. She has been damaged in an amount to be proven at trial, including sums paid under the instrument and the consequential losses alleged herein.

## COUNT XVI — INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE

### (Plaintiff Carolyne Lohr against Defendants Colorado Lake Cooperative, Inc., Cooperative Management, Inc., and Tamie Kaufman)

269.Plaintiff Carolyne Lohr re-alleges each preceding paragraph. This Count is brought under the supplemental jurisdiction of this Court, 28 U.S.C. § 1367(a).

270.Plaintiff had, and has, a prospective economic relationship: the sale of her home. She listed the home for sale through a licensed listing service. At the time of the conduct alleged in

this Count she had an identified prospective purchaser household for an owner-financed sale of the home at a price of $169,000. That household has since withdrawn without stating a reason, and the home remains unsold notwithstanding an active listing and continuing purchaser interest.

271.Defendants Colorado Lake Cooperative, Inc., Cooperative Management, Inc., and Kaufman, each a third party to that relationship, intentionally interfered with it. Defendant Kaufman telephoned Plaintiff Daniel Lohr and asserted that the home could not be sold; she repeated the assertion by email the following day; and the day after that, the notices described in Paragraph 95 appeared on the home, addressed to the very purchasers the listing was written to reach. The interference did not stop when this action commenced. As alleged in Paragraph 98, Defendants thereafter erected a sign at the entrance to the community, identifying Plaintiff's space by number and warning every person who drives in, and directing each of them to Defendants for further information. A landlord has no legitimate business interest in warning the public away from a home its own tenant is lawfully entitled to sell.

272.The interference was accomplished by improper means and for an improper purpose. The means were improper because the statements were false and because what they threatened is forbidden by statute: ORS 90.634(1) and ORS 90.120(1) forbid the lien the notice asserts; ORS 90.680(2) forbids denying a tenant the right to sell and forbids requiring removal solely on the basis of a sale; and ORS 446.676 exempts an owner selling her own home from any dealer-licensing requirement. The purpose was improper: to close the one exit from Section 11 that Defendants do not control, so that the home would be forfeited to Defendants, and to retaliate for Plaintiffs' protected activity. Top Service Body Shop, Inc. v. Allstate Ins. Co., 283 Or 201 (1978).

273.The interference caused injury, and the injury is continuing. No sale has closed. Prospective purchasers were told in writing, on the home itself, that the home may carry debt they must assume and must be removed at their own cost; the identified purchaser household withdrew without stating a reason; and, on information and belief, Defendants' publications have deterred and continue to deter prospective purchasers from completing a purchase. Plaintiff continues to bear the carrying costs of a home she is not permitted to occupy and has been obstructed from selling.

274.Plaintiff has been damaged in an amount to be proven at trial, including the lost or delayed benefit of the sale of the home — including the $169,000 owner-financed transaction that did not close — the carrying costs of the home from the date of the interference, and consequential losses.

## COUNT XVII — SLANDER OF TITLE

**(Plaintiff Carolyne Lohr against Defendants Colorado Lake Cooperative, Inc., Cooperative Management, Inc., and Tamie Kaufman)**

275.Plaintiff Carolyne Lohr re-alleges each preceding paragraph. This Count is brought under the supplemental jurisdiction of this Court, 28 U.S.C. § 1367(a).

276.The elements of the claim are the uttering and publication of the slanderous words by the defendant, the falsity of the words, malice, and special damages. Cawrse v. Signal Oil Co., 164 Or 666, 670, 103 P2d 729 (1940).

277.Defendants published, to prospective purchasers and to the public, written statements disparaging Plaintiff's title to the home: that "the cooperative may have a lien against it"; that a buyer "may be required to cover all debt owed as a result of any lien held against the unit"; and that the "buyer will be required to remove the unit from the community at their own cost." The

statements are false. Defendants hold no lien and can hold none, ORS 90.634(1), ORS 90.120(1), ORS 90.420, and their own Board President has testified under oath that no lien exists. No purchaser is required to remove the home, ORS 90.680(2), and Section 9 of Defendants' own instrument provides that a screened purchaser "must enter into a lease agreement with the Cooperative."

278.The publication was malicious. Defendants published the statements knowing them to be false or with reckless disregard of their falsity: their own Board President's sworn testimony denies the lien; their own instrument contradicts the removal statement; and the publication followed the listing by days and Defendant Kaufman's email by one day, a sequence that bespeaks a purpose to defeat the sale rather than to inform. Defendants thereafter escalated rather than corrected: as alleged in Paragraph 98, they moved the warning from the home itself to the entrance of the community, enlarging the audience from those who came to see the home to every person who drives in, and continuing to direct each reader to Defendants for the "details" that Defendants have elsewhere stated to be a lien they do not hold.

279.The publication caused special damages. Plaintiff has been unable to sell the home and convey clear title notwithstanding an active listing and ready, willing and able purchaser interest; an identified prospective purchaser household for a $169,000 owner-financed sale withdrew without stating a reason during the period of the publications; and Plaintiff has borne the carrying costs of the home throughout the period the published claims have clouded its title. Hubbard v. Scott, 85 Or 1, 12, 166 P 33 (1917); Shenefield v. Axtell, 545 P2d 876 (Or 1976) (allegation that plaintiffs had buyers ready, willing and able to purchase, and were unable to sell because of the published claim, is sufficient).

280.This Count is timely. The publications occurred in and after July 2026. ORS 12.120.

## VII. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

1.Declare that the home at Space 1020 is a dwelling within the meaning of 42 U.S.C. § 3602(b);

2.Declare that Defendants violated 42 U.S.C. §§ 3604(f)(1), 3604(f)(2), 3604(f)(3)(A), 3604(f)(3)(B), and 3617, and ORS 659A.145 and ORS 659A.421;

3.Enjoin Defendants from refusing to permit Plaintiff, through her caretaker and at her expense, to complete the repairs identified in Exhibit A to the Storage Agreement;

4.Enjoin Defendants from enforcing the overnight exclusion, the forfeiture provision, and the termination notice;

5.Order Defendants to issue Plaintiff the residential occupancy agreement issued to every other approved purchaser, or, in the alternative, to approve without further obstruction any qualified purchaser to whom Plaintiff sells the home;

6.Award compensatory damages in an amount to be proven at trial, including out-of-pocket losses, loss of housing, loss of property value, and emotional distress;

7.Award punitive damages under 42 U.S.C. § 3613(c)(1);

8.Award treble damages under ORS 124.100(2);

9.Award damages under ORS 646.641 on Count XI, including actual damages or the statutory minimum, punitive damages, and attorney fees; and enter the declaratory and injunctive relief requested in Count XII;

10.Award statutory damages under ORS 90.710(1)(a), including $1,000 for the third and each subsequent violation of ORS 90.680;

11. Award costs and reasonable attorney fees under 42 U.S.C. § 3613(c)(2) and ORS 659A.885, together with any litigation expenses recoverable by a self-represented party;
12. Award Plaintiff Daniel Lohr compensatory and punitive damages on Counts IX, X and XI, and declare that Defendants may not extinguish his recorded lienholder interest except by judicial process;
13. On Count XIV, award Plaintiff Carolyne Lohr judgment against Defendants Carroll and Fashbaugh, individually, for the remedies provided by ORS 124.100(2), including treble economic and treble noneconomic damages;
14. On Count XV, award Plaintiff Carolyne Lohr judgment against Defendants Carroll and Fashbaugh, individually, for the damages caused by their breach of the implied warranty of authority;
15. On Count XVI, award Plaintiff Carolyne Lohr compensatory and consequential damages for the intentional interference with her prospective sale, in an amount to be proven at trial;
16. On Count XVII, award Plaintiff Carolyne Lohr the special and consequential damages caused by the slander of her title, in an amount to be proven at trial; and
17. Grant such other relief as the Court deems just and equitable.

## VIII. DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury on all issues so triable, pursuant to Fed. R. Civ. P. 38(b) and 42 U.S.C. § 3613(a).

DATED this 5th day of August, 2026.

________________________________________

Carolyne Lohr
Self-Represented Plaintiff
38965 Dexter Rd, Space 20
Dexter, OR 97431
(541) 292-2829
gamechangerbuilding@gmail.com

*Signing on her own behalf only, as to Counts I through VIII and XI through XVII.*

________________________________________

Daniel Lohr
Self-Represented Plaintiff
38965 Dexter Rd, Space 20
Dexter, OR 97431
(541) 292-2829
gamechangerbuilding@gmail.com

*Signing on his own behalf only, as to Counts IX, X, XI, XII and XIII.*